167 Cal.App.3d 946 (1985)
213 Cal. Rptr. 690
In re R.S., a Minor.
DONALD H. et al., Petitioners and Respondents,
v.
TANYA S., Objector and Appellant. Guardianship of R.S., a Minor.
DONALD H. et al., Plaintiffs and Respondents,
v.
TANYA S., Defendant and Appellant.
Docket No. F003748.
Court of Appeals of California, Fifth District.
May 3, 1985.
*953 COUNSEL
Nancy Marsh, under appointment by the Court of Appeal, for Objector and Appellant and Defendant and Appellant.
James B. Preston for Petitioners and Respondents and Plaintiffs and Respondents.
Peter C. Carton, under appointment by the Court of Appeal, for the Minor.
William A. Richmond, District Attorney, and Peter George Champion, Deputy District Attorney, as Amici Curiae on behalf of the Minor.
OPINION
HAMLIN, J.
Tanya S. appeals from the judgment declaring her five-year-old son, R.S. (the minor), free from her custody and control (Civ. Code, § 232, subd. (a)(6))[1] and appointing Donald H. and Debra H. (hereafter petitioners) as guardians of the minor (§ 239). Petitioners filed the petition to free the minor from Tanya's custody and control. In it they alleged that Tanya was and would remain incapable of supporting or controlling the minor because of mental deficiency or mental illness.
Tanya urges on appeal that the judgment terminating her parental rights should be reversed because the trial court failed to make the required finding that immediate termination was the least detrimental alternative to protect the interests of the minor. Additionally, Tanya contends (1) the trial court's findings and judgment are not supported by clear and convincing evidence, (2) both she and the minor were denied effective assistance of counsel, and (3) the trial court should have appointed a guardian ad litem for her. We agree that the trial court's failure to find that immediate termination of the parental relationship was the least detrimental alternative available to protect the welfare of the minor mandates reversal of that portion of the judgment which terminates Tanya's parental rights. We reject Tanya's other contentions and affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND
The minor was born to Tanya on February 2, 1980. His birth certificate indicates Tanya declined to identify the minor's father.
*954 During the first two years of the minor's life, Tanya, who suffers from a mild degree of mental retardation due to brain lesions suffered as a child, was intermittently involved with Central Valley Regional Center (CVRC) in Visalia. That agency tested the minor and concluded he was growing and developing normally. He was getting good care and attention and was not considered developmentally disabled.
From January to December of 1982 Tanya shared living quarters with two different women. Both of them dominated and exploited Tanya, who tends to be a dependent personality. In December Tanya and Jean Gildez, with whom she was living, arranged to place the minor in day care at the First Assembly Baptist Church. When the minor started preschool in January 1983, he was not toilet trained and was observed by his teachers to be somewhat withdrawn and unwilling to interact with other children. The teachers described the minor as immature and behind developmentally. Based primarily on the minor's lack of toilet training, the school insisted that the minor be withdrawn in April 1983.
At Gildez' urging, Tanya gave the minor to petitioners soon after he was withdrawn from school. Tanya signed guardianship papers, and petitioners understood adoption papers were to be forwarded to them by Attorney Mike Duncan. However, the guardianship papers were incorrectly completed and were never filed; no adoption papers were ever prepared. Nonetheless, around May 1, 1983, petitioners returned to their home in Oregon and took the minor with them.
Almost immediately Tanya began to regret her decision to give up the minor. After she left the residence she shared with Gildez, CVRC placed Tanya into a program to aid her in developing independent living skills. CVRC emphasized to Tanya that her best, if not only, chance to recover her son was to gain necessary independent living skills so that she could provide for him. Tanya did well in this program until Gildez reentered the picture because Gildez had decided petitioners should not have custody of the minor but instead he should be returned to Tanya. As a result of Gildez' letter writing and other forms of harassment, Tanya terminated her participation in the program and her involvement with CVRC.
Although petitioners had been advised that Tanya wanted her son returned to her, they filed a petition for guardianship and a petition to terminate Tanya's parental rights on September 6, 1983. Based on a motion by petitioners, the court appointed two psychiatrists to examine Tanya to determine whether she was at that time or would become capable of caring for the minor. Counsel for petitioners and counsel for Tanya stipulated that the doctors' reports could be received in evidence without requiring the doctors *955 to appear in court, but each party reserved the right to call either or both of the doctors to testify. The trial court appointed the District Attorney of Tulare County to represent the minor. It also held a hearing in October 1983 on temporary placement of the minor and ordered that the minor remain in petitioners' custody pending further hearing and that Tanya have a three-hour visit with the minor.
Soon after the hearing on temporary placement, Tanya's private counsel moved to be relieved because Tanya had lost confidence in her and would no longer cooperate. The trial court granted that motion and appointed the Public Defender of Tulare County to represent Tanya. About two and one-half months later the trial court considered petitioners' petitions for guardianship of the minor and to terminate Tanya's parental rights. At the conclusion of the trial on both petitions the trial court found "clear and convincing evidence that there is a severe problem of dependency on the part of Tanya." It further found that there was evidence Tanya had been offered help by way of programs and classes to develop parenting skills and she did not follow through, that the evidence presented was sufficient to sustain the petition, and that it would be detrimental to remove the minor from the present home. The court then granted the section 232 petition and the petition for appointment of petitioners as guardians of the minor. It directed that adoption proceedings should take place in Oregon, where petitioners resided. The trial court filed detailed written findings and judgment on January 30, 1984.

DISCUSSION

I. Failure to Make a Necessary Finding.

At the time the instant petition was filed, section 232, subdivision (a)(6), provided in pertinent part: "(a) An action may be brought for the purpose of having any child under the age of 18 years declared free from the custody and control of either or both of his parents when the child comes within any of the following descriptions:
".... .... .... .... .... .... .
"(6) Whose parent or parents are, and will remain incapable of supporting or controlling the child in a proper manner because of mental deficiency or mental illness, if there is testimony to this effect from two physicians and surgeons each of whom must have been certified either by the American Board of Psychiatry and Neurology or under Section 6750 of the Welfare and Institutions Code or licensed psychologists who have a doctoral degree *956 in psychology and at least five years of postgraduate experience in the diagnosis and treatment of emotional and mental disorders....
"The parent or parents shall be cited to be present at the hearing, and if the parent or parents have no attorney, the court shall appoint an attorney or attorneys to represent the parent or parents and fix the compensation to be paid by the county for such services, if the court determines the parent or parents are not financially able to employ counsel."
Subdivision (6) was added to section 232, subdivision (a), by amendment in 1967. No legislative history is available except the restricted Governor's chapter bill file which contains two letters. The first, from Senator George Danielson, the author of the bill, states in part, "This amendment was carried by me at the request of the Adoption Agencies and is intended to fill a gap which will permit a Court, under proper safeguards, to declare a child free of the custody of parents who are severely afflicted with mental deficiency or mental illness. This is necessary in order that an adoption can be completed." The second letter, from James V. Lowry, M.D., Director of Mental Hygiene of the State Health and Welfare Agency, includes a statement of the purpose of the bill: "This bill is apparently designed to cover a situation where the parent is not committed to a state hospital, but is hospitalized under a Short-Doyle program or similar operation. This would provide local machinery that presently exists for the state hospital situation."
(1) In In re Carmaleta B. (1978) 21 Cal.3d 482, 490 [146 Cal. Rptr. 623, 579 P.2d 514], the California Supreme Court stated, "Mentally ill persons under section 232 have been judicially defined as those persons `(a) [w]ho are of such mental condition that they are in need of supervision, treatment, care or restraint' or `(b) [w]ho are of such mental condition that they are dangerous to themselves or to the person or property of others ...' [Citations omitted.]" The Supreme Court declined to liberalize this definition of mental illness to facilitate termination of parental rights, relying in part upon "the proposition that family rights, both the parent's and the child's rights, should not be vulnerable to a too easy finding of mental illness. Indeed, the strictness of this definition of mental illness has acted as a safeguard to protect the primacy of the family." (Id., at p. 491; see also this court's opinion in In re Mark K. (1984) 159 Cal. App.3d 94, 106 [205 Cal. Rptr. 393].)
(2) In In re Angelia P. (1981) 28 Cal.3d 908 [171 Cal. Rptr. 637, 623 P.2d 198], the Supreme Court considered the possibly conflicting interests which surface in a proceeding to terminate the parental relationship, a relationship described as "biological in nature and most personal in form." *957 (Id., at p. 916.) While affirming that the right to parent is a fundamental one which should be "`disturbed only in extreme cases of persons acting in a fashion incompatible with parenthood' [citations omitted]" (ibid.), the court also recognized that the parenting right is not absolute and may be forced to yield to rights inherent in the child. "More recently the primacy of another consideration [than the traditional parental right or preference doctrine] has evolved in the reasoning of courts, legislatures and commentators which have focused on the child's well-being, seeking to ascertain the `best interest' of and the `least detrimental alternative to the child.' Our Legislature's concern is manifest in its direction that the statutes concerning the termination of parental rights `shall be liberally construed to serve and protect the interests and welfare of the child.' (§ 232.5; [further citations omitted].)" (Ibid.) The Supreme Court then concluded "that findings under any subdivision of section 232 must be made on the basis of clear and convincing evidence. Such a test is fully consistent with the goal of section 232 to provide `the fullest opportunity to the parents for exercise of their rights not inconsistent with the ultimate best interests of the child' [citation omitted] ..." (Id., at p. 919.) Clear and convincing evidence "requires a finding of high probability.... [It requires] that the evidence be `"so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind."' [Citation omitted.]" (Ibid.)
(3) The Supreme Court's recognition in In re Angelia P., supra, that a trial court, in terminating parental rights, must consider the least detrimental alternative to the child is consistent with the opinion of this court in In re David B. (1979) 91 Cal. App.3d 184 [154 Cal. Rptr. 63]. In that case, this court upheld the validity of section 232, subdivision (a)(6), against a challenge that it denied a mother substantive due process "... provided two conditions are met by clear and convincing proof: (1) that the mental deficiency or illness is settled in that it will continue for an indefinite period of time in the future regardless of medical treatment available to the parent; and (2) that the immediate severance of the parental relationship is the least detrimental alternative available to protect the welfare of the child. Where these two conditions are met, the parental relationship may be severed constitutionally without proof of actual harm to the child and without further medical treatment of [the parent]." (In re David B., supra, at p. 192, italics omitted.) (4) In the instant case the trial court did not make the required finding that immediate termination of the parental relationship was the least detrimental alternative available to protect the welfare of the child. This failure mandates reversal of the trial court's order pursuant to In re Angelia P., supra, 28 Cal.3d 908, and In re David B., supra, 91 Cal. App.3d 184. (See also this court's opinion in In re Mark K., supra, 159 Cal. App.3d 94, 107-108.)
*958 As to the necessary finding, based on clear and convincing evidence, "that the immediate severance of the parental relationship is the least detrimental alternative available to protect the welfare of the child" (In re David B., supra, 91 Cal. App.3d at p. 196), this court weighed the parental interest in rehabilitating and thus preserving the parent-child relationship against the interest of the child in a secure environment, recognizing potential detriment to the child when that security is suspended and alternatives to severance of the parental relationship are explored: "In this regard, the judge must carefully explore all reasonable alternatives to severing the parent relationship such as child protective services and temporary foster home care pending efforts to rehabilitate the parent. These alternatives should be employed unless they would result in serious psychological harm to the child. However, if the court determines that available medical and social resources are inadequate to rehabilitate the parent to a level where he or she will be able to assume responsibility for the child, then it becomes inimical to the child's welfare to delay efforts to seek permanent adoptive placement.... [T]he termination of the parental right should also be looked at from the child's viewpoint. `The consensus of expert opinion holds that it is most important to avoid multiple placements for children between six months and three years of age. Each additional placement may retard the development and may impair their ability to form lasting attachments.' [Citation omitted.] The avoidance of lasting psychological harm to the child is the compelling state interest behind prompt severance of the parental relationship. Once the court has determined that there are no reasonable alternatives, severance can be justified as necessary to achieve that compelling state interest." (Ibid.)
In determining whether the trial court in In re David B., supra, 91 Cal. App.3d 184 had adequately investigated reasonable alternatives to severing the parental relationship, this court stated: "... It is well recognized that before the parental relationship may be permanently severed, the trial court should consider the availability of less severe alternatives designed to keep the family intact. [Citations omitted.] Each county welfare department is required by Welfare and Institutions Code sections 16500-16511 to provide a systematic program of child protective services, defined as `public social services which supplement, or substitute for, parental care and supervision....' [Citations omitted.]
"Although the county welfare department did not offer child protective services to appellant prior to filing the petition to free David from her custody, its failure to offer these services does not automatically preclude the trial court from severing the parental relationship. [Citations omitted.] Where the welfare department fails to offer such services, the trial court has discretion to decide whether to order the services prior to terminating the *959 parental relationship [citation omitted]. In making that decision, the trial court should consider the following: `whether there were mitigating circumstances for the department's failure to consider or offer the services, whether the parent or parents were otherwise eligible and qualified to receive them, whether the furnishing of such services would have been appropriate in the first instance and, if so, whether they could offer a solution to the problems presently at hand, and whether the best interests of the child would be seriously jeopardized if the proceedings were delayed unduly.' [Citation omitted.]" (Id., at pp. 198-199.)
In the instant case the trial court made the following remarks: "Now can the Court conclude that it would be likely that training would be effective to help [Tanya] under section 232a(6).
"Of course had there been  had this proceeding been under this section, had this been a normal foster care situation, there would have been this sort of help proferred [sic], but in fact the Court believes that the evidence shows that this kind of help was offered even though it wasn't that  it was made available to her through CVRC, and she never followed through with it, she's been incapable of following through with it.
"And the Court doesn't know, you know, the Court does not believe that good wishes are sufficient.
"You have to show the ability and desire to stay with something, and she does not seem to be able to throw off her dependency on the persons with whom she involves herself to complete any independent program of learning the appropriate skills to understand both and to provide for both the physical and mental needs of the child."
Counsel for petitioners urges that these remarks are sufficient to show the trial court implicitly found that immediate termination of Tanya's parental rights was the least detrimental alternative available. We disagree. Under section 232, subdivision (a)(6), it is necessary that the trial court determine not only that the parent is incapable of supporting and controlling the child at the time of the hearing but must also find the parent will remain incapable of supporting and controlling the child in the future. This is a finding required by the statute itself and is distinct in kind, not just in degree, from the judicially required finding that severance of the parental relationship is the least detrimental alternative available. Thus the trial court's remarks seem reasonably addressed to Tanya's future incapacity, particularly in light of the absence of the express finding required regarding the least detrimental alternative.
*960 More significantly, however, the record before this court does not support the trial court's determination that Tanya consistently failed to follow through on programs made available for her assistance. Petitioners presented testimony of Leonard Hacker of the department of rehabilitation concerning three contacts Tanya made with his department in 1978 and 1979. Hacker testified she had never followed through with those contacts, but more importantly he testified she had had no contact with his agency since 1979. That was a date prior to the birth of her son and also prior to her involvement with CVRC. Fred Barr, program manager of CVRC in Visalia, testified that his agency had provided various services to Tanya over the four to five years she had been a client of the agency, during some of which time her case was on "inactive" status. The services were not necessarily direct services until "the time that she made the request for residential care services which would be a special service that we would purchase." Those services resulted in Tanya's placement at a residential care facility in June 1983, after the minor had been removed to Oregon by petitioners. The records of CVRC concerning Tanya are a part of the record, and the case notes of Ed Martin and Patrick Whalen strongly suggest that Tanya's departure from the residential care facility and her resultant "failure to complete" that program for the development of independent living skills was due in large part, if not exclusively, to the machinations of Jean Gildez. Those case notes suggest that Tanya's progress in the residential care facility was more than satisfactory prior to the reentry of Gildez into the picture.
The record also reveals that Michael Phillipe, a social worker with child protective services in Visalia who had been involved with Tanya because of her son, testified that "[s]he remained in counseling, was attending her adult education, and as to the vocational  vocational training, which was through Regional Center to my knowledge, she dropped out of that program." The vocational training referred to was the residential care facility discussed above. Also before this court are Tanya's records from Visalia Community Counseling Service where Tanya was "readmitted" to counseling in July 1982 and continued on a regular program of counseling through August 1983.
Admittedly, Tanya's withdrawal from the residential care facility was not in her best interests and was probably ill advised given her stated desire to regain custody of her son. However, in light of Tanya's mild mental retardation and obvious problems in coping, plus her inordinate dependency on Jean Gildez, it isn't surprising that she withdrew from this program at a time when she was obviously suffering a great deal of frustration in her efforts to regain her child. Thus, the trial court's observation that "good wishes" are not enough must be considered in light of the evidence presented which established much more than good intentions to achieve a better *961 and more independent life for herself, and possibly for her son. We note that Michael Phillipe of child protective services testified that, although his involvement with Tanya had terminated when her son was no longer in her custody, child protective services would again be available to Tanya if her son were restored to her. Fred Barr testified that the services of CVRC would also be available to Tanya upon request.
The absence of an express finding that termination of Tanya's parental rights was the least detrimental alternative available to protect the welfare of the minor would not require us to reverse this judgment if we could satisfy ourselves from the record that the trial court adequately explored less detrimental alternatives than immediate severance. We cannot. Although it is discretionary with the trial court to order further services, there is nothing to indicate the discretion was even exercised here. That is in contrast to In re Angelia P., supra, 28 Cal.3d 908, where the Supreme Court stated in part, "Here the trial court properly considered alternatives and was fully free to decide that termination was appropriate. Angelia had been in foster care for almost four years, yet her parents, after having rejected an earlier return, requested an even further delay until some uncertain future date when, if all went well, Angelia could be returned to them." (Id., at p. 923.)
Similar factors were considered by this court in In re Susan M. (1975) 53 Cal. App.3d 300, 312 [125 Cal. Rptr. 707], including the mother's three-year absence from California rendering her unable to receive child protective services from the welfare department, the mother's mental and other problems, the absence of any indication of a strong maternal interest in the child, and a four-year interval between the child's declaration as a dependent child of the juvenile court and the institution of termination proceedings to permit adoption by the foster parents of those four years.
In In re Heidi T. (1978) 87 Cal. App.3d 864 [151 Cal. Rptr. 263] the mother suffered from a chronic form of schizophrenia which rendered her "incapable of providing either emotional support or proper parental control for the two children." (Id., at p. 873.) The mother's lack of motivation due to this chronic mental illness offered little likelihood of success in a referral to child protective services; thus, there was no abuse of discretion in failing to order such services. (Id., at p. 874.) Similarly, the severity of the mother's mental illness in In re David B., supra, 91 Cal. App.3d 184 could not be adequately provided for through the available social service agencies, based upon the testimony of the directors of those agencies.
In contrast, in In re Michael G. (1983) 147 Cal. App.3d 56 [194 Cal. Rptr. 745], which is, significantly, a case dealing with developmental disabilities *962 as opposed to severe and chronic mental illness, the appellate court affirmed a decision of the trial court refusing to terminate parental rights and stated in part, "However, the evidence also disclosed that Michael's parents, despite their parenting limitations, love their child, and have consistently expressed an interest in his welfare. There was a bonding of parent and child during Michael's early years when he was in the custody of his parents. In his present foster home situation, Michael is permitted periodic visits with his parents, and nothing in the record indicates such visits are detrimental to Michael. Most important, there was expert testimony that placement of Michael in an appropriate foster home could provide him both with the consistency of parenting that he needs and the opportunity to maintain a relationship with his natural parents." (Id., at p. 61.)
We note that in In re Michael G., supra, the foster parents did not desire to adopt the child, and this lack of immediate prospect for adoption did enter into the trial court's decision that termination of parental rights would not be in the minor's best interests. However, Michael Phillipe testified in this case that he had strongly recommended to Tanya that she consider Tulare County's "Fost-Adopt" program in which the minor would be made a ward of the juvenile court and placed in foster care in Tulare County while Tanya attempted to gain the appropriate parenting skills. Although Tanya rejected this suggestion and proceeded with her wishes to place the minor with petitioners (apparently at the insistence of Jean Gildez), the instant case does not reflect the long-term foster care and the documented inability, based on mental illness, to maintain a parent-child relationship which characterized the decisions, like In re Angelia P., summarized above.
Under these circumstances it is not possible for this court to remedy the failing of the trial court by making a finding, based on clear and convincing evidence, that immediate termination of Tanya's parental relationship with her son was the least detrimental alternative available. We therefore reverse the decision of the trial court terminating Tanya's parental rights and remand the matter to the trial court with appropriate instructions for the taking of further evidence. Particularly in light of Tanya's somewhat limited mental faculties, due process requires that she be clearly advised of the goals required of her and given a time period within which she is to accomplish the goals or demonstrate meaningful progress. Although we will conclude that petitioners' guardianship of the minor need not be changed at this point, the trial court will undoubtedly want to consider visitation by Tanya during the period she is attempting to develop the necessary independent living skills to support and control the minor. Visitation may be necessary to prevent further deterioration of Tanya's relationship with her son.
Our decision to remand the matter to the trial court for further proceedings does not mean that Tanya's compliance with all orders of the trial *963 court, including living apart from Gildez and cooperating with CVRC, can operate as a guarantee that Tanya's son will be restored to her. Assuming she does succeed within a reasonable time in developing those independent living skills which are necessary if she is to support and control her child, the court must still consider the best interests of the minor at that time and could not ignore any detriment to the minor, subject of course to proof, if he were to be removed from petitioners' home. We simply hold that, without an express finding that immediate termination was the least detrimental alternative available, termination of the parent-child relationship less than nine months after Tanya had released the minor to petitioners was precipitous, giving due consideration not only to the circumstances of that surrender but the apparent refusal of petitioners for at least six of those months to return the child to Tanya when they knew she wanted him and knew they had no legal right to keep him.

II. Clear and Convincing Evidence to Support Trial Court's Findings.

A. Finding that an award of custody to Tanya would be detrimental to the minor.

(5) The applicable standard when a challenge is made to the sufficiency of the evidence to support the trial court's finding in a termination proceeding was articulated by the Supreme Court in In re Angelia P., supra, 28 Cal.3d 908, 924: "We apply, with appropriate modifications, our holding in People v. Johnson (1980) 26 Cal.3d 557, 578 ..., made in accordance with Jackson v. Virginia (1979) 443 U.S. 307 ...: `the [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence  that is, evidence which is reasonable, credible, and of solid value  such that a reasonable trier of fact could find [that termination of parental rights is appropriate based on clear and convincing evidence].' [Citations omitted.]" (Brackets in original.)
(6) This court in In re David B., supra, 91 Cal. App.3d 184 rejected an argument by the appellant mother that a finding of actual harm was required before the state could intervene in the parent-child relationship. The court stated in part, "`When, as here, a parent is incapable of meeting the child's essential needs, ... the state may constitutionally intervene to protect the "physical or mental well-being" of the child. In these circumstances, the interest of the parent in keeping the child conflicts with the interest of the child in its essential physical and emotional needs and the Legislature has constitutionally mandated that the interests of the weaker party, the child, should prevail.'" (Id., at p. 195.)
*964 (7) The evidence in the instant case was virtually uncontroverted that, at the time of the hearing, Tanya was not able to take care of her minor son by herself. Dr. Davis, Dr. Kleist, and Dr. Powell all testified that Tanya was then incapable of caring for the minor on her own; their opinions were supported by Tanya herself who testified in response to questions by her attorney:
"Q. [Mr. Arick for Tanya] Now, do you feel at the present time you can take care of [R.S.] by yourself?
"A. [Tanya] No.
"Q. Are you requesting the Court to have [R.S.] brought back to the county?
"A. Yes, if they could.
"Q. And place him in foster care?
"A. Yes.
"Q. And it's during that time that you'll go back and try to get your skills together?
"A. Yes.
"Q. And to take care of the baby?
"A. Yes, yes."
Contrary to Tanya's contention that the trial court was obligated to find some actual harm in order to conclude that Tanya's custody of the minor would be detrimental to him, it is clear from this court's opinion in In re David B., supra, 91 Cal. App.3d 184 this is not the case. Moreover, there was evidence that the minor's essential physical and emotional needs were not, in fact, being satisfied when he was in his mother's custody and they were both living with Jean Gildez.
Without giving undue weight to the numerous declarations furnished by the friends and neighbors of petitioners and submitted on their behalf, Michael Phillipe of child protective services, who observed the minor at a temporary custody hearing in October, noted improvement in the child after his five months in petitioners' custody. "He was far more articulate. Seemed happy. He was obviously quite a bit heavier, and had filled out and *965 had gotten larger, looked very good. [¶] You know, from a non-medical standpoint he looked very healthy to me. [¶] ... [¶] As far as I knew, he was potty trained at that time. He had not been prior to leaving."
In light of this testimony, we conclude that substantial evidence did support the trial court's conclusion that restoring custody to Tanya at the time of the hearing would be detrimental to the minor. Since the trial court's order regarding custody is severable from the order terminating Tanya's parental rights, we affirm that portion of the trial court's order awarding custody of the minor to petitioners.

B. Finding that Tanya was and would remain incapable of caring for and controlling the minor because of mental disability.

(8) The issue of whether clear and convincing evidence supported the trial court's determination that Tanya would remain incapable of supporting and controlling the minor must be considered in the light of our discussion above concerning the trial court's failure to adequately consider less detrimental alternatives to the immediate and permanent termination of Tanya's parental relationship with the minor. Tanya argues on appeal that she could raise the minor properly with supportive services and contends that failure to consider the possibility of such supportive services when her disability is a mental one, as opposed to supportive services routinely provided to parents with physical disabilities, shocks the conscience. She states, "It would be a denial of the Fourteeth Amendment's equal protection clause if 232(a)(6) were to be read to require more from those persons unable to live independently because of mental disabilities than from those unable to live independently because of physical handicaps."
However, we believe mental disabilities differ in kind, not merely in degree, from physical handicaps. This distinction is apparent in section 232 itself, and the legislative history discussed above, insofar as the statute specially provides at subdivisions (a)(5) and (a)(6) for the children of parents suffering severe mental incapacity or disorder. Obviously, a parent confined to a wheelchair who requires supportive services to manage physical housekeeping chores, as well as satisfying certain of the physical needs of a dependent child, may still independently satisfy the social, emotional, and mental needs of that child and so, with limited help, satisfy the child's essential needs. This analogy does not automatically transfer and become applicable to parents with mental disabilities. Mental retardation/developmental disability can be of such severe degree that the person suffering such disability is not only incapable of caring for himself or herself (and any dependent child) physically, but emotionally, socially and mentally as well. Under such circumstances, supportive services would mean little more than *966 "foster care" for both parent and child, a situation not necessarily in the best interests of either.
However, as discussed above, Tanya's degree of developmental disability is not that severe nor is her "dependent personality disorder" necessarily a handicap that could not be alleviated by proper supportive services, different from the "support" provided by Jean Gildez. Dr. Powell pointed out in his report, "... I recommended that Tanya could care for her child pending hearing on the petition providing she was in a well-supervised setting and not with Mrs. Gildez. At that time Tanya's lawyer described to me a supervised, but independent living, situation in Fresno run by the Fresno Association for the Retarded. It sounded very good and I supported this placement. I would not recommend that Tanya be permitted to live alone with her son."
The recommendations of Drs. Davis, Kleist, and Powell were summarized above. Additionally, Dr. Davis testified that in his opinion "[Tanya] is and will remain incapable of supporting or controlling her child in a proper manner, because of her mental deficiency, and mental illness." Dr. Kleist opined "that she would not be able to provide adequate care for the psychological and physical needs of the child, unless she were living with some other care giver." Therefore, according to the literal terms of the statute, there was substantial evidence to support the trial court's finding that Tanya would remain incapable of supporting or controlling her minor child.
However, as discussed above, the trial court failed to make the necessary express finding that immediate termination of Tanya's parental relationship was the least detrimental alternative and correspondingly failed to inquire into alternatives which might encompass "supportive services." Without such a finding and inquiry the issue of whether Tanya would remain incapable of caring for her son even with supportive services, assuming such are available, should necessarily be examined when the trial court makes its determination of the least detrimental alternative available to protect the welfare of the minor.
(9) Tanya also contends the trial court erred in failing to consider whether a plan to provide reunification services to her and her son was ever offered to her. At the time of the proceeding in the instant case, section 232, subdivision (a)(7), provided for the termination of parental rights on behalf of a child who had been cared for in any of certain specified out-of-home placements under the supervision of specific agencies for a period of one year when return of the child to the parent(s) would be detrimental to the child and the parent(s) had failed and would likely continue to fail to *967 provide a home for the child, provide care and control for the child and maintain an adequate parental relationship with the child. However, the subdivision also provided that termination of parental rights under these circumstances required the trial court to make a determination that reasonable "reunification" services had been offered or provided to the parent(s) but such services had been ineffective in rehabilitating the parent(s), i.e., return of the child to the natural parent(s) would be detrimental to the child.
As petitioners point out, section 232, subdivision (a)(6), contains no similar requirement for reunification services. However, under this subdivision we believe the trial court, in finding by clear and convincing evidence that immediate termination of the parental relationship is the least detrimental alternative to protect the interest of the child, effectively fulfills the role performed by the county department of social services in a proceeding brought under subdivision (a)(7). In contrast to the grounds on which the parental relationship can be terminated in other subdivisions of section 232,[2] subdivisions (a)(5) and (a)(6) permit severance of the relationship for inability to support or to care for or to control a minor child, and subdivision (a)(7) permits severance for failure to maintain an adequate parental relationship. Given the fundamental nature of the parenting right, due process can only be assured and the potential for abuse avoided when the trial court or the department of social services, in a proceeding to terminate parental rights on such subjective criteria, has fully explored alternatives to severance of the parental relationship and found such alternatives inadequate to protect the welfare of the child. As stated in 4 Markey, California Family Law Practice and Procedure (1984) Freeing Minors for Adoption, section 71.14[3], pages 71-22  71-23: "The state can permanently sever the parent-child relationship on the basis of the parents' mental deficiency or illness, even though the parents have never actually harmed the child, if the trial court finds the following:
"(1) That on the basis of the consistent opinions of two physicians, the parent's mental illness or deficiency is settled, in that it will continue in the foreseeable future regardless of any medical treatment that would be available to the parent; and
"(2) That the immediate severance of the parental relationship is the least detrimental alternative available to protect the welfare of the child. In this *968 regard, the judge must carefully explore all reasonable alternatives to severing the parental relationship such as child protective services and temporary foster home care pending efforts to rehabilitate the parent. These alternatives should be employed unless they would result in serious psychological harm to the child." (Fn. omitted.)
Counsel for the minor correctly notes that petitioners were private petitioners pursuant to section 232 and were not required to offer reunification services to anyone. However, it is precisely this situation which particularly requires the watchful eye of the trial court to insure that private parties seeking to adopt a child and who, fortuitously, can provide the child a "better" home and more "advantages" than can his natural parents are not able to obtain custody of a minor and then rely upon his improved situation to justify termination of the rights of his natural parents. Thus while the statute does not require a reunification plan when termination of parental rights is based upon the mental disability of the natural parent or parents, the judicially imposed requirement that such termination must be preceded by an express finding of the trial court that termination is the least detrimental alternative, and the concomitant requirement that the trial court consider alternatives other than termination, serve the same purpose.
On rehearing to determine if termination of Tanya's parental rights is the least detrimental alternative available to protect the welfare of the minor, the trial court is obligated to consider the other alternatives, if any. Thus, it seems reasonable to expect the trial court to consider both the availability of supportive services to help Tanya cope with her disability and a possible reunification plan, presumably encompassing some visitation as discussed above, within the overall framework of evaluating possible alternatives.

III. Effective Assistance of Counsel for Tanya.

(10) After the trial court granted a motion by Tanya's first attorney, Nancy Owens-Cierley, to be relieved based on a breakdown in the attorney-client relationship, the public defender, through Deputy Howard Arick, was appointed to represent Tanya in these proceedings as statutorily required by section 232, subdivision (a)(6). At the time of these proceedings, that subdivision provided in part, "... and if he, she, or they have no attorney, the court shall appoint an attorney or attorneys to represent the parent or parents...." (Italics added.) Tanya now contends that she was denied effective assistance of counsel. Without deciding whether the standard articulated by the Supreme Court in People v. Pope (1979) 23 Cal.3d 412, 425 [152 Cal. Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1], was applicable, this court nonetheless held in In re David C. (1984) 152 Cal. App.3d 1189, 1206 [200 Cal. Rptr. 115], "Certainly, as counsel was appointed for the *969 indigent parents in the instant case, the parents had a right to have effective assistance of counsel. After a thorough review of this record, it can be demonstrated that counsel for appellants made a number of omissions significantly affecting appellants' rights."
Of course, the standard articulated in People v. Pope, supra, 23 Cal.3d 412, no longer stands by itself, having been broadened by the holding of the Supreme Court in People v. Fosselman (1983) 33 Cal.3d 572 [189 Cal. Rptr. 855, 659 P.2d 1144]. These two cases represent current California law establishing the criteria for determining effective assistance of counsel in criminal proceedings. They are equally instructive in evaluating the effectiveness of counsel in a proceeding to terminate parental rights, in which appointment of counsel for indigent parents is required by statute.
In People v. Pope, supra, 23 Cal.3d 412 our Supreme Court set out a two-step test to determine the adequacy of counsel. "[A]ppellant must show that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, appellant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (Id., at p. 425.) The same court stated in People v. Fosselman, supra, 33 Cal.3d at page 581: "Reviewing courts will reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission. In all other cases the conviction will be affirmed and the defendant relegated to habeas corpus proceedings...." Moreover, the Supreme Court in People v. Fosselman concluded "that in cases in which a claim of ineffective assistance of counsel is based on acts or omissions not amounting to withdrawal of a defense, a defendant may prove such ineffectiveness if he establishes that his counsel failed to perform with reasonable competence and that it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings. [Citations omitted.]" (Id., at p. 584.)
Against this standard, Tanya asserts four areas in which trial counsel was allegedly ineffective. They will be discussed seriatim.

A. Failure to object to admission of hearsay.

(11a) Relying upon the decision in People v. Williams (1971) 22 Cal. App.3d 34 [99 Cal. Rptr. 103], Tanya contends trial counsel was ineffective in stipulating to the admission of hearsay. At the beginning of the session on January 25, counsel for petitioners stated, "There's also a stipulation that the other documents were admitted into evidence yesterday, exhibits for the purposes of establishing the basis of the two doctors' conclusions, *970 will also be admitted for purposes of the case in chief." After defense counsel indicated his concurrence, the court stated, "Well, the Court will order the declarations referred to in Dr. Davis's supplemental report will be received as  not only for the purpose of establishing the doctor's opinion, but also for all purposes as though part of petitioner's [sic] evidence in their case in chief." This evidence included the declarations of the four day-care providers mentioned above, and a variety of declarations provided by friends and neighbors of petitioners concerning the minor's progress and the adequacy of petitioners' home. Defense counsel also offered no objection to the admission of Tanya's records from CVRC as well as her records from the Visalia Community Counseling Services. Copies of counseling records maintained by both agencies were accompanied by declarations from the custodians of those records relating to their authenticity.
In People v. Williams, supra, 22 Cal. App.3d 34 defendant appealed from a conviction of first degree murder. His defense had been that he was in the "throes of a psychomotor epileptic attack as a result of which he lacked the consciousness to be aware of his actions or to deliberate upon the gravity of his act, premeditate, and harbor malice." (Id., at p. 38.) Defense counsel neither objected to nor moved to strike questions of a witness by the district attorney which elicited responses based on hearsay and which substantially undermined the defendant's defense of diminished capacity. The court held that "absence of positive reaction to [this line of questioning] by defense counsel amounted to an inadequacy of legal representation in a crucial stage of the trial." (Id., at p. 46.) The court also characterized counsel's omission "as a breakdown in legal representation which substantially reduced the strength of defendant's claim of totally diminished capacity. This can be equated with the frequently reiterated concept of `withdrawing a crucial defense.' [Citation omitted.]" (Id., at p. 50.)
A similar result was reached in In re Julius B. (1977) 68 Cal. App.3d 395, 403 [137 Cal. Rptr. 341]. There, defense counsel himself elicited hearsay evidence from prosecution witnesses, and the court stated: "We can find nothing to explain defense counsel's conduct on the basis that there was a knowledgeable choice of tactics being made by him. It is hornbook law, and should be known by any attorney  experienced or fledgling  that the extrajudicial statements of Mack Thomas that accused the minor of murder, made to Officers Knott and Ortiz, constitute inadmissible hearsay if offered against the minor in an adjudicatory hearing in the juvenile court....
"The underlying policy of excluding hearsay testimony that does not satisfy the requirements of some hearsay exception, is that fundamental fairness *971 rejects the notion that determinations of fact can be made upon untrustworthy evidence."
In this case the declarations of the day-care providers, at least, were based in large part on inadmissible hearsay, and the hearsay was of a particularly damaging and highly untrustworthy nature. Many of the comments of the day-care providers concerning the minor's appearance and development were based on statements made to them by Jean Gildez concerning the relationship of Tanya and the minor. Given the highly questionable role Gildez played in this entire proceeding, we cannot conceive of a basis on which those statements could have been admitted as substantive evidence. Thus, we are not persuaded by petitioners' contention on appeal that defense counsel's trial stipulation was merely a tactical judgment to prevent a parade of damaging witnesses before the trial court. Since the day-care providers could not have testified as to what Jean Gildez told them, their declarations establishing the same information without being subject to cross-examination should certainly have been excluded. Statements contained in those declarations concerning Gildez' explanation that Tanya caused the scratches on the minor's face, that Tanya wouldn't let the minor use the bathroom at home, and that Tanya and the minor fought over toys were clearly not within the knowledge of the day-care providers. We can conceive of no reason why Tanya's counsel should have made it possible for those declarations to be considered evidence as a part of petitioners' case-in-chief.
However, even though Tanya's trial counsel could have no tactical basis for stipulating to the admission of so much highly questionable hearsay, we are not persuaded that Tanya has met her burden of proving her claim of inadequate trial counsel. (See this court's opinion in In re Richard W. (1979) 91 Cal. App.3d 960, 973 [155 Cal. Rptr. 11].) The trial court's spoken findings at the conclusion of the hearing on January 25 leave substantial doubt that the trial court, in fact, relied upon this inadmissible hearsay evidence in reaching its conclusions. Stated another way, even were this inadmissible evidence removed from consideration, there remains substantial evidence to support the trial court's findings and conclusions, such as they were. For example, the court stated, "He was  showed some unexplained signs of injury to his face, and the Court does not believe that  that  the Court believes that these are indications of his fears and upsets, lack of weight gain, and all the other matters contained in the records before the Court show that  that he suffered in this regard, and that the  he was not supported or controlled in a proper manner." The trial court thus recognized the scratches were unexplained, as opposed to any overt reliance on Gildez' explanation that Tanya caused the scratches. The trial court did note that Tanya apparently lacked the ability to take the minor's temperature, based upon a report from the Visalia Community Counseling Services of September *972 21, 1982. That was refuted by Dr. Powell's subsequent examination of Tanya indicating she did possess the knowledge and ability to take the minor's temperature. However, this does not appear to have been a significant factor in the trial court's decision.
(12) Similarly, Tanya argues her counsel was ineffective in allowing her mental health records to be received in evidence. We disagree. In contesting the termination proceeding brought under section 232, subdivision (a)(6), Tanya did, in fact, place her mental condition at issue and justify the trial court's reliance upon properly authenticated records of mental health treatment.
(11b) While Tanya's trial counsel did err in stipulating to the admission of declarations containing otherwise wholly inadmissible hearsay, we are not convinced this error rendered trial counsel ineffective within the Pope/Fosselman standard. It is not reasonably probable that a result more favorable to Tanya would have been arrived at in the absence of counsel's failing.

B. Failure to assert the attorney-client privilege.

(13) As mentioned above, Tanya was originally represented by Attorney Nancy Owens-Cierley, but this representation terminated on motion by Owens-Cierley based on a breakdown in the attorney-client relationship and Tanya's unwillingness to cooperate with Owens-Cierley further. Both from Dr. Davis and on cross-examination of Tanya herself, petitioners' attorney inquired, without objection by defense counsel, as to the basis for this termination, specifically, that Owens-Cierley had strongly recommended that Tanya reenter a program with CVRC, which Tanya declined to do.
We believe this line of questioning had a significant impact on the trial court's decision in that the necessary findings under section 232, subdivision (a)(6), include a finding that the natural parent will remain incapable of supporting and controlling the minor child. The trial court apparently relied upon Tanya's failure to complete the independent living program offered at the residential care facility and sponsored by CVRC in commenting about Tanya's unwillingness to participate in necessary treatment programs. It is reasonable to believe that the judge's comment was also influenced by Tanya's failure to follow her attorney's advice to reenter a CVRC program. What Tanya was advised to do by her attorney is clearly within the attorney-client privilege, and Tanya's trial counsel erred in failing to object to this line of questioning. (See, e.g., People v. Dorsey (1975) 46 Cal. App.3d 706, 718-719 [120 Cal. Rptr. 508].)
However, we are again not persuaded that Tanya has met her burden of proving this omission rendered trial counsel ineffective. There was certainly *973 objective evidence on which the trial court could have based its conclusion that Tanya did not follow through with help which was offered to her. Were the only evidence of this unwillingness the fact she had declined to follow advice of her attorney, counsel's failure to object to this impermissible line of questioning might well require reversal. Based, however, on the presence of other evidence to support the trial court's conclusion, we believe it is not reasonably probable that a result more favorable to Tanya would have been reached had trial counsel properly objected to any questions concerning advice given to Tanya by her former attorney.

C. Failure to request a determination on his client's competency.

D. Failure to object to appointment of the district attorney to represent the minor.

Since these two issues are asserted independently as bases for reversal of the judgment, trial counsel's effectiveness with respect to these issues will be considered in the discussion of each issue.

IV. Effective Assistance of Counsel for the Minor.

(14a) (15a) As previously noted, petitioners moved the court for appointment of independent counsel to represent the interests of the minor, in response to which the trial court appointed the District Attorney of Tulare County. Relying upon this court's opinion in In re David C., supra, 152 Cal. App.3d 1189, Tanya now contends the representation of the district attorney was inadequate. She points particularly to the district attorney's failure to examine her on her competency, his failure to examine all of the witnesses presented by petitioners, and his failure to call Jean Gildez as a witness.
(14b) On motion by the district attorney and by order of this court, the deputy district attorney who represented the minor, Peter George Champion, has submitted an amicus curiae brief and a declaration outlining the steps he took in his representation of the minor. In his declaration, Champion explains that any "failure" to cross-examine Tanya or other witnesses was predicated only upon his determination "that all trustworthy and reliable information was available to the judge." Since Tanya has pointed to no specific deficiencies which could have been cured by additional cross-examination by counsel for the minor, we reject her general allegation that such lack of cross-examination constituted ineffective assistance of counsel.
(15b) The deputy district attorney also stated that his determination not to call Jean Gildez to the stand was based upon "[t]he evaluations and *974 opinions of almost all the professionals involved with the Gildez-[Tanya] relationship [which] were reasonably supported by facts that her current behavior was aimed toward self-seeking exploitive machinations and not the best interest of [the minor]." Our review of the record does not persuade us that Tanya correctly characterizes Gildez as "a person close to the situation whose testimony would have been relevant and material to the issue of whether [the minor's] interests would be better served by a severance of all ties to his natural mother." When independent counsel is appointed for the minor, his trial tactics must be determined by his evaluation of what constitutes the minor's best interests. It appears from counsel's declaration that he had determined the minor's best interests would be served by remaining with petitioners; to the extent Gildez sought to terminate petitioners' custody of the minor at the time of trial, her testimony might have served Tanya's interests but not necessarily those of the minor.
(16) Although Tanya and petitioners focus their contentions only on the adequacy of counsel provided to the minor, counsel appointed for the minor on appeal argues strenuously that appointment of the district attorney in section 232 proceedings should be absolutely proscribed. He points out various potential conflicts of interest which exist in this case, including the public defender's representation of Tanya, the possibility of a proceeding pursuant to Welfare and Institutions Code section 300, the possibility of criminal neglect charges, and the possibility that the minor would state he wanted to be returned to his mother.
The focus in the argument presented on behalf of the minor and the concern of this court in In re David C., supra, 152 Cal. App.3d 1189 appear to be the potential for conflicts of interest on the part of a district attorney's office called upon to represent a child in a termination proceeding when that same office may find itself involved with the child or his natural parents in other, tangentially related proceedings. The district attorney points out, however, that while such "dual" involvement may trigger a conflict situation in some circumstances, it also may give rise to a situation in which a child has been represented by the district attorney in a Welfare and Institutions Code section 300 proceeding and has developed a rapport with that counsel which would cause detriment to the child if severed in a later proceeding to terminate parental rights.[3]
*975 Appointment of counsel in section 232 proceedings is governed by section 237.5, which provided at the time of these proceedings: "At the beginning of the proceeding on a petition filed pursuant to this chapter counsel shall be appointed as follows:
"(a) The court shall consider whether the interests of the minor require the appointment of counsel. If the court finds that the interests of the minor do require such protection, the court shall appoint counsel to represent the minor. If the court finds that the interests of the minor require the representation of counsel, counsel shall be appointed whether or not the minor is able to afford counsel. The minor shall not be present in court unless the minor so requests or the court so orders.
"(b) If a parent appears without counsel and is unable to afford counsel, the court shall appoint counsel for the parent, unless such representation is knowingly and intelligently waived. The same counsel shall not be appointed to represent both the minor and his or her parent.
"(c) The public defender or private counsel may be appointed as counsel pursuant to this section. Private counsel appointed under the provisions of this section shall receive a reasonable sum for compensation and expenses, the amount of which shall be determined by the court. Such amount shall be paid by the real parties in interest, other than the minor, in such proportions as the court deems just. However, if the court finds that any of the real parties in interest are unable to afford counsel, the amount shall be paid out of the general fund of the county.
"(d) The court may continue the proceeding for not to exceed 30 days as necessary to appoint counsel, and to enable counsel to become acquainted with the case."
*976 With respect to representation of a minor in a termination proceeding by the office of the district attorney, this court stated in In re David C., supra, 152 Cal. App.3d 1189: "Even though this statute by the permissive `may' does not specifically preclude the appointment of the district attorney and we find no cases to guide us on this issue, we believe a clear reading of the statute indicates that if the trial court exercises its discretion and appoints counsel for a minor, the most appropriate counsel might be the public defender or private counsel. Some section 232 situations might eventually lead into criminal prosecution against parents and the court should be aware of a possible conflict of interest.
"While we are not prepared to hold that the court erred in appointing the deputy district attorney in the instant case, we suggest in the future private counsel might be a more appropriate choice to represent the minor in a situation where the parents are represented by the public defender." (Id., at p. 1206.)
Recent cases reflect an increased sensitivity to the potential for conflicts of interest when government attorneys are called upon to wear two or more hats. (See, e.g., Civil Service Com. v. Superior Court (1984) 163 Cal. App.3d 70 [209 Cal. Rptr. 159]; People ex rel. Deukmejian v. Brown (1981) 29 Cal.3d 150 [172 Cal. Rptr. 478, 624 P.2d 1206].) That sensitivity emphasizes the importance of the problem recognized by this court in In re David C., supra, 152 Cal. App.3d 1189. Notwithstanding the provisions of Welfare and Institutions Code section 300 et seq., encompassing as those provisions do the possibility of an ongoing attorney-client relationship between the district attorney and the minor, the trial court and the district attorney are required to consider whether any actual or potential conflict exists in the district attorney's representation of a minor in a termination proceeding. To permit effective appellate review, the record should reflect a finding by the court that no such actual or potential conflict will inhibit the district attorney's representation.
Thus, in keeping with the spirit of section 237.5, the trial court in a proceeding to terminate parental rights should look first to the public defender or private counsel to provide independent counsel for the minor, if such is required. However, when the trial court finds either (1) the district attorney has established an attorney-client relationship with the minor which would be detrimental to the minor if disrupted or (2) other particular circumstances of the case indicate the district attorney can best protect the independent interest of the minor, the trial court may properly appoint the district attorney upon an express finding that no actual or potential conflict between the office of the district attorney and any other party in the termination proceedings exists.
*977 (17) In addition to its concerns about the appointment of the district attorney to represent a minor child in a proceeding to terminate the rights of his or her natural parent(s), this court in In re David C., supra, 152 Cal. App.3d 1189 considered a contention that the representation of the minor had been ineffective. On that issue, this court observed: "The role of counsel for the child is not merely to act as a mouthpiece for the minor child. But neither is counsel to act as a mouthpiece for the governmental agency concerned. The whole purpose behind section 237.5 is to provide independent counsel, when necessary, for the protection of the minor's interests. We suggest, at a bare minimum, counsel for the minor should thoroughly review the record, interview the child when appropriate, considering such factors as health and age, and consider some type of contact with the child's foster and natural parents in order to make an informed judgment on behalf of his client. Independent medical and psychological assessment might be necessary in appropriate cases. Only by such endeavor can the court be assured that counsel for the minor is truly independent and is informed enough to represent the child's best interests." (Id., at p. 1208.)
It is important to repeat that this court in In re David C. did nothing more than suggest actions which might ordinarily be appropriate for counsel appointed to represent a minor in a termination proceeding to permit him to make an informed judgment of how he can best protect and serve the minor's interest. Counsel so appointed should consider those options, as well as any others which would occur to a competent attorney in similar circumstances. Certain aspects of the representation can and should be reflected in the record, e.g., independent medical or psychological examinations of the minor, the natural parent(s), or potential foster or adoptive parent(s) when counsel has deemed such examinations in the child's best interests. Counsel will, however, undertake other inquiries, such as personal interviews, which may or may not be fully reflected in the record based on the attorney-client privilege. A challenge to the effective representation of the minor's counsel must identify specific deficiencies as well as the alleged relevance or necessity of the acts "omitted" by the minor's counsel. Appellate courts are well equipped, when guided by such specifics, to assess the effectiveness of counsel based upon an otherwise "cold" record. There is no reason to impose sweeping mandatory requirements on counsel appointed to represent minor children in termination proceedings above and beyond those to be expected of reasonably diligent counsel acting as advocates. Discretion must be left in the attorney to assess the needs of his client, i.e., the minor child, and make the necessary decisions.
The record in this case, including the declaration of the deputy district attorney who represented the minor, convinces us the minor was effectively *978 represented. Accordingly, Tanya's trial counsel was not ineffective in failing to object to this representation.

V. The Trial Court's Failure to Appoint a Guardian Ad Litem.

(18a) Tanya's final contention is that the trial court erred in failing to appoint a guardian ad litem for her pursuant to the provisions of Code of Civil Procedure sections 372 and 373. Code of Civil Procedure section 372 provides, inter alia, "[w]hen a minor, an incompetent person, or a person for whom a conservator has been appointed is a party, such person shall appear either by a guardian or conservator of the estate or by a guardian ad litem appointed by the court in which the action or proceeding is pending, or by a judge thereof, in each case." Code of Civil Procedure section 373 provides in pertinent part, "When a guardian ad litem is appointed, he or she shall be appointed as follows: [¶] ... [¶] (c) If an insane or incompetent person is a party to an action or proceeding, upon the application of a relative or friend of such insane or incompetent person, or of any other party to the action or proceeding, or by the court on its own motion."
(19a) The Supreme Court stated in Sarracino v. Superior Court (1974) 13 Cal.3d 1, 12 [118 Cal. Rptr. 21, 529 P.2d 53], "Although these provisions permit the appointment of a guardian ad litem for a party who already has a general guardian of his estate, they do not require any prior independent adjudication of incompetency. [Citation omitted.] Incompetency may exist independently of any judicial determination thereof. [Citation omitted.]" Counsel for the parties have not cited and we have not discovered any judicial explication of the minimum standard of competency that triggers the necessity of appointment of a guardian ad litem. However, Tanya contends in this connection that her trial counsel was ineffective in failing to move for a judicial evaluation of her competency. She argues that initiation of section 232, subdivision (a)(6), proceedings should be sufficient to alert the court to the necessity for an inquiry into her competence to participate meaningfully in the proceedings.
We recognize that there is necessarily a certain amount of tension between the interests of a parent in contesting a proceeding to terminate parental rights pursuant to section 232, subdivision (a)(6), and the interest of that same parent in meaningful participation in the judicial proceeding. Both of those interests depend, to a greater or lesser extent, upon the parent's mental abilities and capacities. To the extent a parent contests the effort to terminate his parental rights, he necessarily contends that any mental disease or deficiency from which he suffers does not render him incompetent to support and control his minor child. Such a parent may be reluctant, as may his attorney, to assert in the same proceeding that the parent is mentally incompetent *979 to personally participate in the judicial proceedings and requires the appointment of a guardian ad litem to protect his interests. Under these circumstances, we must rely upon trial counsel, acting in the best interests of his client, and upon the court itself, acting to preserve the integrity of the judicial proceedings, to assure that no person incompetent or otherwise incapable of understanding the proceedings against him be forced to participate in a proceeding at which significant rights are at stake. Similar reliance upon the interests and integrity of the trial court and trial counsel is apparent in Penal Code section 1368 which provides for suspension of criminal proceedings when a doubt arises in the mind of trial counsel or in the trial court as to the competency of a criminal defendant to stand trial.
In the instant case, it is clear Tanya appeared personally throughout. No guardian ad litem was appointed for her nor does the record indicate any proceedings were undertaken to determine her competency to understand the nature of the proceedings against her. However, there is nothing in the record to suggest any lack of such understanding. Moreover, the record discloses that Tanya's counsel was aware of his responsibility to assure that no person incapable of understanding the proceedings against him or her should be forced to participate in those proceedings. He interrupted the minor's counsel when he asked Tanya, "You understand that the Court has to make the decision in this matter, and the judge will make a decision  " Tanya's counsel interrupted, stating, "Your Honor, I don't know what the District Attorney's questioning is designed to do, but as to the relevance of asking her if she understands what the Court's decision is, she understands what's going on. I don't think that's really relevant to this proceeding, to ask her about whether she understands what's going on. [¶] If I didn't think she understood what was going on, we would have been dealing with incompetency to be seated here, and doing [sic] this at all."
(18b) (19b) We find nothing in the record to suggest that trial counsel's election not to request an examination of Tanya's competency was unfounded or ill advised. Furthermore, our review of the record convinces us that the trial court did not abuse its discretion in failing to exercise its express power under Code of Civil Procedure section 373 to act, on its own motion, to appoint a guardian ad litem for a party to an action when that party appears to be incompetent. That statutory protection for civil litigants generally is adequate to protect the rights of parents who may be incompetent to understand the judicial nature of proceedings brought against them to terminate their parental rights.
Notwithstanding Tanya's documented mild mental retardation and her dependent personality disorder, the record here establishes that Tanya did understand the nature of the proceedings against her and was able to meaningfully *980 participate in those proceedings and to cooperate with her trial counsel in representing her interest.
We therefore conclude that neither the trial court nor Tanya's trial counsel ignored evidence that Tanya's abilities were so limited that she was effectively rendered incompetent to understand the nature of the proceedings or to assist her counsel in representing her interest so as to require appointment of a guardian ad litem.
The trial court's judgment terminating Tanya's parental rights is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion. In all other respects, the trial court's judgment is affirmed.
Franson, Acting P.J., and Best, J., concurred.
NOTES
[1] All further statutory references are to the Civil Code unless otherwise stated.
[2] Section 232 also provides for termination of parental rights on grounds of (1) abandonment for a prescribed period; (2) neglect or cruel treatment when the minor has been a dependent child of the juvenile court and the parent(s) have been deprived of custody for one year; (3) disability because of substance abuse, or moral depravity, when the minor has been a dependent child of the juvenile court and the parent(s) have been deprived of custody for one year; (4) conviction of a felony when the facts of the crime are such to prove the parent(s) unfit to have custody of the child; and (5) severe physical abuse rendering the minor a dependent child of the juvenile court.
[3] The involvement of the district attorney with a minor child before the juvenile court in a Welfare and Institutions Code section 300 proceeding is, to some extent required by the interplay of Welfare and Institutions Code sections 318 and 351, which provide:

Welfare and Institutions Code section 318: "(a) Notwithstanding the provisions of Section 317, when a minor who is alleged to be a person described in subdivision (d) of Section 300 appears before the juvenile court at a detention hearing, the court shall appoint counsel. The court may appoint the district attorney to represent the minor pursuant to Section 351.
"(b) The counsel appointed by the court shall represent the minor at the detention hearing and at all subsequent proceedings before the juvenile court.
"(c) Any counsel upon entering an appearance on behalf of a minor shall continue to represent that minor unless relieved by the court upon the substitution of other counsel or for cause.
".... .... .... .... .... .... ."
Welfare and Institutions Code section 351 provides: "In a juvenile court hearing, where the minor who is the subject of the hearing is represented by counsel, the district attorney shall, with the consent or at the request of the juvenile court judge, appear and participate in the hearing to assist in the ascertaining and presenting of the evidence. Where the petition in a juvenile court proceeding alleges that a minor is a person described in subdivision (a), (b), or (d) of Section 300, and either of the parents, or the guardian, or other person having care or custody of the minor, or who resides in the home of the minor, is charged in a pending criminal prosecution based upon unlawful acts committed against the minor, the district attorney shall, with the consent or at the request of the juvenile court judge, represent the minor in the interest of the state at the juvenile court proceeding. The terms and conditions of such representation shall be with the consent or approval of the judge of the juvenile court."