[No. F009866. Fifth Dist. Feb. 15, 1989.]

In re VICTORIA M. et al., Minors.
STANISLAUS COUNTY DEPARTMENT OF SOCIAL SERVICES,
Petitioner and Respondent, v.
CARMEN S., Objector and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, IV and VI.

**COUNSEL**

Nancy Marsh, under appointment by the Court of Appeal, for Objector and Appellant.

Michael H. Krausnick, County Counsel, and Harry P. Drabkin, Deputy County Counsel, for Petitioner and Respondent.

Patricia L. Watkins, under appointment by the Court of Appeal, for Minors.

**OPINION**

**STONE (W. A.), J.—** ■ In this action we are called upon to determine whether, before severance of the parent-child relationship pursuant to Civil Code[1] section 232, a developmentally disabled natural parent is entitled to services which are responsive to the family's special needs in light of the parent's particular disabilities. In addition to other issues we will discuss, we will hold that before the parental rights of a developmentally disabled parent can be properly terminated the record must establish by clear and convincing evidence that services specially designed to meet the needs of the developmentally disabled have been explored and that, despite the availability of such services, it is in the best interest of the children to be declared free for adoption.

### STATEMENT OF THE CASE

Carmen S. appeals from a judgment pursuant to Civil Code section 232, subdivisions (a)(2) and (a)(7), declaring her three children, Victoria, born May 12, 1978, Eufemio, born December 4, 1979, and Aline, born January 18, 1982, free from her custody and control.

---

[1] We are here concerned with the pertinent sections of the Welfare and Institutions Code and the Civil Code as they read in 1986 and 1988. We recognize that the statutory scheme has since changed; however, the substance of our analysis would have equal meaning and effect under the present law.

The Stanislaus County Department of Social Services (DSS) took the three children into protective custody on February 24, 1986, and filed petitions pursuant to Welfare and Institutions Code section 300, subdivision (d). The court declared the minors dependent children and placed them in foster homes. Victoria and Aline were ultimately placed with a foster/adopt family; Eufemio remained in a foster home.

DSS filed a petition to terminate the parental rights of Carmen S. and the children's father, Armando S. M., on June 9, 1987. The petition alleged that the children had been abandoned by their father. The father did not appear to contest the termination of his parental rights, nor has he appealed.

The court appointed counsel for Carmen S. on July 16, 1987, and held a termination hearing December 9 through 11, 1987. Witnesses at the hearing were the psychologist who evaluated Carmen and her three children, three social workers assigned to the case at different times during the 23-month period, the operator of the receiving home to which the children were initially taken, two counselors affiliated with the Valley Mountain Regional Center (VMRC), a counselor with Therapeutic Homes, Inc., (THI) Carmen, and her fiancé. Following the hearing, the court declared the minors to be free from the custody and control of their natural parents. Judgment was entered January 19, 1988.

The petition was sustained on allegations under both subdivision (a)(2) and (a)(7) of Civil Code section 232. Subdivision (a)(2) permits termination if the court finds by clear and convincing evidence that (1) the child has been neglected or cruelly treated, (2) the child has been a dependent of the juvenile court under Welfare and Institutions Code section 300, and (3) the child has been out of the parents' custody for one year. Subdivision (a)(7) permits termination if the court finds by clear and convincing evidence that (1) the child has been in out-of-home placement for one year, (2) return of the child would be detrimental to the child, (3) the parents have failed and are likely to fail in the future to maintain an adequate parental relationship with the child, which includes providing both a home and care and control for the child, and (4) reasonable services were offered to the parent or parents to overcome the problems which led to the loss of custody in the first instance, but despite the availability of these services, return of the child to the parent would be detrimental to the child.

### STATEMENT OF THE FACTS

Carmen is a woman in her mid-30's who has limited mental capabilities. She attended special classes while in school and in 1980 tested in the range of mild mental retardation with an IQ of 58. In 1987 her IQ was measured

at 72, in the borderline range of intelligence. She is the mother of seven children. None of the children was living with her at the time of the hearing on the Civil Code section 232 petition.

Carmen had used social service agencies in the community extensively. According to the original social worker assigned to the case, Janice Holden, the Salvation Army was no longer willing to provide her with assistance because she had used their services to an excess. The Stanislaus County Department of Social Services had worked with Carmen prior to the removal of her children, but the record is unclear regarding the type or extent of assistance provided. She had a history of frequent moves and insufficient food for her children.

The children were removed from Carmen's custody in February 1986. She and the children were being evicted from the motel where they resided. The children were filthy and had head lice so severe that their heads had to be shaved. The girls had scabies. Eufemio had previously suffered an accidental burn on his arm for which he had been hospitalized. A skin graft had been performed using skin from his leg. As a result of inadequate attention, the donor site had become infected; the skin had grown over the bandage and his trousers had to be peeled off. The basis for the Welfare and Institutions Code section 300 petition was that Carmen had persistently failed to provide the children with proper care.[2]

Carmen discussed and signed her first reunification contract April 22, 1986. As a condition of reunification with her children she was required to obtain and maintain stable, suitable housing for her family, including adequate sleeping accommodations, a kitchen and a good food supply; to maintain acceptable housekeeping standards; to undergo a psychological examination to assess her ability to parent and care for her children; to maintain regular visitation and demonstrate appropriate parenting skills during visitation; to cooperate with services available through VMRC; to participate in a parenting skills training program and achieve satisfactory reports; to inform the social worker of her current address at all times; and to participate in an individual counseling program to learn how to protect herself and her children from physical and sexual abuse and receive satisfactory reports.

---

[2] The petition charged Welfare and Institutions Code section 300, subdivision (d), which provided at that time: "Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:

" . . . . . . . . . . . . . . . . .

"(d) Whose home is an unfit place for him or her by reason of neglect, cruelty, depravity, or physical abuse of either of his or her parents, or of his or her guardian or other person in whose custody or care he or she is."

Carmen was not provided with active assistance in obtaining suitable housing. She was told about the Stanislaus County Housing Authority and advised to read the newspaper and keep her eyes open as she drove around town. Her only source of income at the time was approximately $250 in general welfare assistance.[3] She could have received advance AFDC funds if the lack of housing had been the only obstacle to her obtaining custody of the children.

According to Carmen's second case worker, Nancy Villereal, by the time of the six-month hearing held August 12, 1986, Carmen had not obtained suitable housing. She had been living in a motel or with friends. She had not been evaluated by a psychologist because Villereal had not had time to make arrangements for the evaluation. She had participated in parenting skills classes through THI and, although she had tried very hard and had been cooperative, she received a poor prognosis. According to a letter from her THI counselor prepared for the six-month status hearing: "[Carmen's] inability to grasp and understand the skills requires that each topic be broken into small sections and repeated over several counseling sessions. Her low level of functioning makes it difficult for her to learn the necessary skills she needs to adequately parent her children as well as manage her unstable life-style."

Carmen participated minimally in the program offered by the Stanislaus County Child Abuse Treatment Team. Although the coordinator of the program, Debra Johnson, questioned whether Carmen would benefit from the services offered, it was recommended that reunification not take place until Carmen attended more regularly in order to establish a support group.

The requirement that she cooperate with the services offered by VMRC was included because Eufemio was a client of the Regional Center.[4] He had been a client since 1983. Eufemio has an IQ of 74 and suffers from "Attention Deficit Disorder with Hyperactivity." He has been under treatment with thorazine or ritalin to stabilize his behavior. The services provided by VMRC were designed to address Eufemio's problems and Carmen's parenting skills in relation to Eufemio and to help her control the child's behavior. Cooperation with VMRC to help Carmen overcome her own problems was not included in the reunification contract.

---

[3] Carmen apparently told one of her social workers that she would soon be receiving back payments from SSI. However the checks had been sent to her mother, who would not cash them for her. Finally, just before the Civil Code section 232 hearing, with the assistance of VMRC, she received the back payments in her own name and was receiving monthly SSI checks for $446.67.

[4] We presume VMRC functions as a service for developmentally disabled persons and was established pursuant to Welfare and Institutions Code section 4629 et seq.

George Hiatt, a marriage and family counselor, provided parenting training for Carmen through VMRC. Although he attempted to teach Carmen skills to deal with her son, she was unable to apply the skills. After four to five months of training, his services were discontinued because they were unsuccessful. The record is not clear whether these services were offered before or during the period covered by the reunification contract. It does not appear that the DSS caseworkers assigned to Carmen's case were aware of what services VMRC provided Carmen and her son.

Carmen became a client of VMRC in June of 1986. In November of 1987, VMRC arranged for Carmen to attend a program at Community Continuum College designed to assist people who have problems functioning independently in the community. Although her counselor at VMRC testified regarding past dealings with Carmen in relation to her son, he did not testify regarding her current status and progress as a client of VMRC. DSS did not monitor her progress at VMRC.

By court order Carmen was allowed visitation with her children once a month. She actually visited the children every month to eight weeks. When all three children were together she had difficulty controlling their behavior; Eufemio generally became aggressive, once to the point of requiring physical restraint. When she visited Eufemio separately from the girls, his behavior was more acceptable.

Initially, Carmen visited her children at the office of DSS because she had not obtained stable housing. At one point, her social worker evaluated Carmen's mother's home as a possible site for visitations, but found it dirty and cluttered with old cars filled with garbage in the front yard. In August of 1987 the children began to visit Carmen at her residence where she was living with her boyfriend, Steven H.[5]

Carmen was evaluated by Dr. Steven Carmichael, a clinical psychologist, on August 13 and on August 31, 1987. According to Dr. Carmichael's written evaluation submitted for assessment of the Civil Code section 232 petition, Carmen showed "no signs of bizarre thought or other signs of psychotic symptomatology," but suffered from an organic condition which "does interfere with her ability to accurately perceive situations and to respond to requirements of a simple task." She tested in the range of borderline intelligence and was assessed as having a "low level of functioning." Dr. Carmichael testified: "[W]hile [Carmen] displays certain intellectual ability to know what might be in the best interest of the children, my concern is

---

[5] At the time of the Civil Code section 232 hearing in December 1987, Carmen and Steven were engaged to be married. According to both Carmen and Steven, they had been living together at this same apartment for about two years.

that she may not know how to apply the knowledge base she has about children in a practical and healthy way for the children, in other words, in evaluating her ability to know certain information about childrearing and child development.

"It was my assessment that although she could name certain facts and certain ways of dealing with the kids that it may not—she may not know how to effectively apply those principles and care for the needs of the children."

Dr. Carmichael opined that Carmen could handle her life by herself with "a measure of success." However, she would be unable to care for her children independently without continuing support of social service agencies and other people who could assist her in her childrearing activities. Even if such services were available, he questioned whether she had the capacity to follow through.

Although the two girls, Victoria and Aline, expressed the desire to live with their mother, they had both adjusted well to the environment of the foster/adopt home and had bonded with their foster/adopt parents. According to Dr. Carmichael, it would be detrimental to the girls for them to be returned to their mother and in their best interests to be freed for adoption by their foster/adopt parents with no further contact with their mother.

The prognosis for Eufemio was not positive. He also wished to be with his mother, but, according to Dr. Carmichael, he needs special attention and treatment which his mother cannot provide. His chances of being adopted are minimal. The recommendation was that he not be placed in a normal foster home, but that he be housed in a residential treatment facility.

Carmen S. challenges the judgment terminating her parental rights on several grounds. First, she contends that the decision fails to indicate whether the court applied the appropriate standard of proof by clear and convincing evidence. Second, she challenges the sufficiency of the evidence to support the findings under Civil Code section 232, subdivision (a)(7), and the sufficiency of the evidence to support the finding that termination of the parent-child relationship is in the best interests of the children and is the least detrimental alternative under the circumstances of the case. Finally, she asserts that the actual reason for sustaining the petition was her lack of mental capacity and that her parental rights cannot be terminated on this basis without complying with the procedural requirements of Civil Code section 232, subdivision (a)(6), specifically, evidence by either testimony or affidavits from two qualified experts.

Carmen does not challenge the sufficiency of the findings under subdivision (a)(2) of Civil Code section 232.

Counsel for the minors does not challenge the order declaring Victoria and Aline free for adoption, but contends that the court abused its discretion in regard to Eufemio since he is not adoptable.

DISCUSSION

PART I*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

PART II

*Sufficiency of the Evidence to Support the Finding Pursuant to Civil Code Section 232, Subdivision (a)(7) That Reasonable Services Were Offered to Carmen*

■ The right of parents to raise their own children is so fundamental that termination of that right by the courts must be viewed as a drastic remedy to be applied only in extreme cases. (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514].) ■ Accordingly, there must be clear and convincing evidence of the facts necessary to declare minors free from the custody and control of their parents under Civil Code section 232. (*In re Angelia P.,* [1981] 28 Cal.3d 908, 918.) The standard of clear and convincing evidence requires a finding of high probability; the evidence must be so clear as to leave no substantial doubt; it must be sufficiently strong to command the unhesitating assent of every reasonable mind. (*Id.* at p. 919; *In re Terry E.* (1986) 180 Cal.App.3d 932, 949 [225 Cal.Rptr. 803]; *In re R. S.* (1985) 167 Cal.App.3d 946, 957 [213 Cal.Rptr. 690].)

■ The duty of a reviewing court, however, is to determine whether there is any substantial evidence to support the trial court's findings. (*In re Terry E., supra,* 180 Cal.App.3d at p. 949.) In making this determination we must decide if the evidence is reasonable, credible and of solid value—such that a reasonable trier of fact could find that termination of parental rights is appropriate based on clear and convincing evidence. (*In re Angelia P., supra,* 28 Cal.3d at p. 924.)

---

*See footnote, *ante,* page 1317.

Carmen contends there is insufficient clear and convincing evidence to support the trial court's finding under subdivision (a)(7) of Civil Code section 232 that reunification services were provided or offered which were reasonably designed to aid her to overcome the problems which led to the continued loss of custody of her children. DSS contends that services were continually offered which were designed to provide parenting skills, the lack of which, according to DSS, led to Carmen's loss of custody.[6]

Carmen's children were originally removed from her custody because of lack of housing, but the Welfare and Institutions Code section 300 petition was sustained on the ground of parental neglect, which was based upon the fact that the children were infested with lice and scabies and that Eufemio's wound had not received proper attention. There is also evidence that DSS and other agencies had previously been involved with the family because the children had behavioral problems in school and the family lacked housing and adequate food. DSS had previously intervened to provide Carmen with counseling to develop appropriate parenting skills.

According to Janice Holden, Carmen's first social worker after the children were removed, the reunification plan was developed based upon contacts with Carmen and other agencies who had previously worked with Carmen. The plan made available to Carmen services designed to counsel her regarding parenting skills.

There is nothing in the reunification plan itself which appears to be tailored to Carmen's intellectual limitations. However, according to her parenting skills counselor, Yvonne McLoughlin, Carmen's history and the history of her children were taken into consideration in tailoring the parenting skills program to Carmen's needs. McLoughlin described the parenting skills taught in her program as follows: "What we teach are positive parenting classes. They cover a broad spectrum of skills. Actually, we start out with helping our clients understand the court process, the different legal steps that they have to go through and have them establish in a first group session their family goals, what their objectives would be, and then help them achieve those goals as close as possible. We cover child safety, a lot of child development—especially in Carmen's case—positive discipline, time-out procedures versus severe punishment, teaching a different way of parenting for a lot of parents, child safety, coping, stress management, child

---

[6] DSS quotes from a letter from a Dr. Watman which is contained in the juvenile court file which concludes that Carmen was receiving "more than enough professional help." The juvenile records are not before this court. There is no indication from the record before us regarding who Dr. Watman is or in what capacity he was involved in the dependency proceedings, other than testimony by Nancy Villereal that Carmen had been referred by Dr. Watman to the Parents' United Program.

self-control and parent self-control, what would be appropriate reinforcers for good behavior, how to deal with inappropriate behaviors in a more positive way."

McLoughlin was unaware that Carmen's children were brought in with lice and scabies and that Eufemio's wound had not been properly cared for. She spent very little time with Carmen on hygiene. In fact, none of the services provided pursuant to the reunification plan addressed health and hygiene concerns because it was assumed that Carmen was aware of them.

The plan also required Carmen to obtain a three-bedroom residence. Despite the fact that the social workers were aware of Carmen's intellectual limitations and that her only source of income was $250 from general assistance, she was not assisted in finding housing. According to Holden, there was insufficient staff to provide such assistance, so parents were re- quired to find housing on their own.

After six months Carmen still had not obtained suitable housing. By this time Carmen had a second social worker, Nancy Villereal. Villereal dis- cussed the Stanislaus County Housing Authority with Carmen and told her to read the newspaper and to keep her eyes open as she drove around town. Villereal was aware of Carmen's limited financial resources but testified that Carmen indicated she had several possibilities for additional income and that she had a plan for obtaining housing. Villereal was aware of Carmen's limited mental capacity from her own observations of Carmen.[7] Despite Carmen's obvious handicaps and the fact that she had not obtained housing after six months, according to Villereal, no direct assistance was provided because Carmen did not request assistance and because there was no indica- tion that Carmen was having trouble with housing.

Her third social worker, Howard Lower, did not assist Carmen in finding housing because he understood that Carmen's mother was providing assis- tance. Reunification efforts ceased one month after Lower was assigned to the case, eight months after the children had been removed from Carmen's custody and almost one year before the hearing on the Civil Code section 232 petition.

The first probation officer's report recommended against granting the Civil Code section 232 petition because Carmen was not provided assistance in finding suitable housing. The probation officer changed this recommen-

---

[7] Villereal did not arrange for a psychological examination of Carmen as required in the reunification plan. It does not appear that Villereal was aware of the previous examination which indicated that Carmen had an IQ in the range of mild mental retardation. She was aware, however, that Carmen was being evaluated by VMRC as a possible client.

dation after receiving the psychological evaluation of Carmen and her children prepared by Dr. Carmichael. He recommended instead that the petition be granted as to Victoria and Aline so that they could be adopted by their foster/adopt parents, but denied as to Eufemio.

The record is clear that no accommodation was made for Carmen's special needs in providing reunification services. Indeed, one of the social workers testified that the only thing special about Carmen's reunification contract was that she was required to obtain counseling to learn how to protect herself and her children from physical and sexual abuse. Everyone was aware that Carmen had mental limitations. They had access from the onset to a psychological evaluation from 1980 identifying Carmen as being mildly mentally retarded. They failed to arrange a second evaluation until after Carmen had participated in the required counseling programs in which, not surprisingly, she failed to show signs of progress. The only person who seems to have taken Carmen's intellectual limitations into account was her parenting skills counselor. Even though Carmen tried hard and took some of the classes three times, she was unable to understand the skills or to apply them. Much of the evaluation by Dr. Carmichael was based upon Carmen's poor performance in the parenting skills program.

Carmen obviously is developmentally disabled. Welfare and Institutions Code section 4512 includes mental retardation or "handicapping conditions found to be closely related to mental retardation" within its definition of "Developmental disability." Her disability should have been apparent to those assessing the suitability of services offered to her. And yet Carmen's disabilities were not considered in determining what services would best suit her needs.

Regional centers such as VMRC are specifically designed to provide services to persons such as Carmen.[8] The services available through regional centers include: ". . . specialized services or special adaptations of generic services directed toward the alleviation of a developmental disability or toward the social, personal, physical, or economic habilitation or rehabilitation of an individual with such a disability, and includes, but is not limited to, diagnosis, evaluation, treatment, personal care, day care, domiciliary care, special living arrangements, physical, occupational, and speech

---

[8] See Welfare and Institutions Code section 4620 which provides in part: "In order for the state to carry out many of its responsibilities as established in this division, the state shall contract with appropriate agencies to provide fixed points of contact in the community for persons with developmental disabilities and their families, to the end that such persons may have access to the facilities and services best suited to them throughout their lifetime. It is the intent of this division that the network of regional centers for persons with developmental disabilities and their families be accessible to every family in need of regional center services."

therapy, training, education, sheltered employment, mental health services, recreation, counseling of the individual with such disability and of his family, protective and other social and sociolegal services, information and referral services, follow-along services, and transportation services necessary to assure delivery of services to persons with developmental disabilities." (Welf. & Inst. Code, § 4512, subd. (b).)

Such services were never considered for Carmen. She was required to cooperate with VMRC concerning Eufemio, but the evidence does not show that Carmen herself was considered by DSS as a possible candidate for such services and referred to VMRC for evaluation. Although Carmen eventually became a client of VMRC, it was not at the request of DSS, nor does it appear that any of the social workers knew what services VMRC was providing to her and whether this would be the appropriate vehicle for enabling her to overcome the problems which led to her continued loss of custody of her children. Such a referral should have been made at the outset. In light of Carmen's limitations, the services offered were insufficient.

However, our conclusion that there is insufficient evidence to support the finding that reasonable services were offered pursuant to Civil Code section 232, subdivision (a)(7), does not end our consideration. The court also sustained the petition under subdivision (a)(2), which requires no such finding, and Carmen does not challenge the sufficiency of the evidence to support the findings under subdivision (a)(2).

PART III

*Sufficiency of the Evidence to Support the Finding That Termination of Carmen's Parental Rights Is the Least Detrimental Alternative*

██ In addition to the specific findings required by Civil Code section 232, subdivisions (a)(2) and (a)(7), before the parent-child relationship can be terminated on any ground, the court must find that it is not in the best interest of the child to return to the custody of the parent (*In re Carmaleta B., supra,* 21 Cal.3d at p. 489) and that termination of parental rights is the least detrimental alternative. (Civ. Code, § 4600; *In re Carmaleta B., supra,* 21 Cal.3d at p. 196.) In determining whether immediate severance of the parental relationship is the least detrimental alternative, the court must carefully explore all reasonable alternatives. (*In re R. S., supra,* 167 Cal.App.3d at p. 958.) It must weigh the parent's right to rehabilitation and preservation of the parent-child relationship and the child's interest in a secure environment. (*Ibid.*)

Although not directly on point, *In re R. S.* is particularly instructive. It involved the termination under Civil Code section 232, subdivision (a)(6), of the parental rights of a borderline mentally retarded woman to her young son based upon her lack of mental capacity. The trial court failed to make a finding that termination was the least detrimental alternative to protect the welfare of the child. (167 Cal.App.3d at p. 957.) The reviewing court could not satisfy itself from the record that the trial court had adequately explored less detrimental alternatives to immediate severance. (*Id.* at p. 961.) Of particular significance to the resolution of the issues before us is that the trial court in *In re R. S.* failed to explore what services were available through the Central Valley Regional Center. (*Id.* at pp. 960-961.)

 ■ We recognize that the purpose of Civil Code section 232 in permitting termination of parental rights is to serve the best interests of a child by providing the stability and security of an adoptive home and that the state not only has a compelling interest but a duty to order severance once a situation contemplated by the statute arises. (*In re Laura F.* (1983) 33 Cal.3d 826, 837 [191 Cal.Rptr. 464, 662 P.2d 922].) However, the rights of a developmentally disabled parent may not be terminated without first assessing whether the services offered by the state through regional centers may enable the family of a disabled person to remain intact.

We do not hold that the trial court is compelled to deny the petition and to order that further services be provided by VMRC. The court is required, however, to explore the possible alternatives. Once it has considered these alternatives to severance, it is within the court's discretion to order further services, if appropriate, or to conclude that further services would not be fruitful. (*In re R. S., supra,* 167 Cal.App.3d at p. 961.)[9]

PART IV*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

PART V

*De Facto Termination for Lack of Mental Capacity*

 ■ Carmen's final argument is that the termination of her parental rights was based entirely upon her mental incapacity and that the Civil

---

[9] Although Carmen's counselor at VMRC, Terry Johnson, testified at the hearing, he was not questioned regarding what services were being offered to Carmen and whether services were available that would enable Carmen to keep her family together.

 * See footnote, *ante,* page 1317.

Code section 232 petition cannot be sustained on this basis without following the procedures set forth in section 232, subdivision (a)(6).[10]

Subdivision (a)(6) requires the testimony of two qualified experts. The record does not reveal whether Dr. Carmichael met the qualifications. Even if he did, his testimony alone is not sufficient under subdivision (a)(6).

Despite reports from Carmen's counselors regarding her limited capacity to grasp the skills being taught, the 1980 psychological evaluation identifying Carmen as borderline mentally retarded and the conclusion of Dr. Carmichael that she lacked the mental capacity to provide adequate care for her children, DSS contends that it was not apparent to the social workers that Carmen was suffering from a mental disability. For this reason the petition did not seek to terminate Carmen's parental rights under subdivision (a)(6). Indeed, DSS denies that the basis for termination was her lack of mental capacity. "That [Carmen] ultimately proved incapable of being able to apply the skills that the various agencies tried to teach her is not necessarily a mechanical function of intellect, but involves a whole panoply of personality."

Nevertheless, our review of the record reveals that Carmen's mental limitation was the fundamental reason for Carmen's failure to succeed at reunification efforts and to demonstrate an ability to care for her children adequately. It does not necessarily follow, however, that a petition to terminate her parental rights must be pursued under subdivision (a)(6) to the exclusion of all other subdivisions of Civil Code section 232.

If the petitioner can sustain its burden under subdivision (a)(7), including reunification services designed with the family of a mentally disabled parent in mind, subdivision (a)(7) is an appropriate procedure. If, however, generic reunification services are offered to a parent suffering from a mental incapacity such as retardation, failure is inevitable, as is termination of parental

---

[10] Civil Code section 232, subdivision (a)(6), provides in part: "(a) An action may be brought for the purpose of having any child under the age of 18 years declared free from the custody and control of either or both of his or her parents when the child comes within any of the following descriptions:

". . . . . . . . .

"(6) Whose parent or parents are mentally disabled and are likely to remain so in the foreseeable future. As used in this subdivision, 'mentally disabled' means that a parent or parents suffer any mental incapacity or disorder which renders the parent or parents unable to adequately care for and control the child. The evidence of any two experts, each of whom shall be either a physician and surgeon, certified either by the American Board of Psychiatry and Neurology or under Section 6750 of the Welfare and Institutions Code, or a licensed psychologist who has a doctoral degree in psychology and at least five years of postgraduate experience in the diagnosis and treatment of emotional and mental disorders, shall be required to support a finding under this subdivision."

rights. ▮▮ Moreover, if the fundamental inadequacy of the parent is a developmental disability, it must be demonstrated under any of the subdivisions of section 232 that the court explored alternatives to severance, such as services offered by the state for developmentally disabled persons. Such a requirement protects the interests of the mentally disabled parent while at the same time allowing the petitioner under section 232 the flexibility to choose the appropriate basis for seeking to terminate parental rights.

### PART VI*

The judgment declaring the minors free from the custody and control of their mother, Carmen S., is reversed and the cause is remanded for further hearing in order that the trial court may make findings on the issues discussed in this opinion.

Hamlin, Acting P. J., and Baxter, J., concurred.

---

*See footnote, *ante*, page 1317.