Filed 1/7/15  In re S.F. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re S.F., Jr., a Person Coming Under the Juvenile Court Law. | B256408<br>(Los Angeles County<br>Super. Ct. No. DK03397) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>S.F., Sr.,<br><br>     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen Marpet, Commissioner.  Affirmed in part and reversed in part with directions.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

————————————

S.F., Sr., (father) appeals from a dispositional order denying his request for custody of his six-month-old son, S.F., Jr., (S.F.) who was removed from his mother's custody under Welfare and Institutions Code section 361.[1]  Father contends the juvenile court erred when it amended the allegations of the petition to conform to proof at the jurisdictional hearing after respondent Department of Children and Family Services (DCFS) had chosen not to do so, and that the evidence is, in any event, insufficient to support the sustained amended allegation against him.  Father argues further that the juvenile court erred by failing to consider and make appropriate findings regarding his custody request under section 361.2. We conclude that father's final contention has merit.  Accordingly, we will reverse the dispositional findings as to father and remand the matter for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

On February 2, 2014,[2] DCFS received a referral that L. P. (mother), the mother of then six-month-old S.F., had untreated mental health issues (had been diagnosed as bipolar and/or schizophrenic, had hallucinations and heard voices), and was providing inadequate care for her son.  According to the referral, the mother kept the "very skinny" child on a diet, the baby's diaper often was soaked through to his clothing, and he cried continuously while mother yelled at him to shut up.  The referral also alleged that mother often left S.F. alone for 30 to 60 minutes and that father, who had recently been released from prison, was not involved in the infant's care and did not reside in the home.[3]

A Children's Social Worker (CSW) visited mother's home the day DCFS received the referral.  During that visit, mother confirmed she had been diagnosed as bipolar, but claimed she could control her illness.  Mother told the CSW she lived alone with S.F. and did not receive help from or get along with anyone.  When the CSW asked mother if she had

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] All further date references are to 2014.

[3] Mother is not a party to this appeal.

2

been involved in a violent relationship, she responded that she "beat the shit out of people." Mother said she took good care of S.F. and denied that he had any medical issues. Mother said father visited S.F. sometimes, but could not recall when he had last seen his son. Father had been in prison and was currently on parole. Mother later told DCFS that father was present at S.F.'s birth, had lived with her and the baby for about a month and provided for S.F. "whenever he could."

Mother agreed to participate in a metal health assessment the results of which revealed she was bipolar with psychotic features. Mother told the assessor she wanted to but had been unable to refill her prescription medications because her doctor wanted to place her on an involuntary psychiatric hold pursuant to section 5150. She revealed that she had previously been placed on section 5150 holds five times and had been threatened with another section 5150 hold the week before. Mother said father had a medical marijuana card and she and he smoked marijuana the month before.

The CSW interviewed the maternal grandmother (grandmother) who expressed concerns about S.F.'s safety in mother's care due to her mental health problems and refusal to seek treatment. Grandmother said mother had stopped taking psychotropic medication for her schizophrenia and bipolar disorder about three years earlier. She had visited mother and S.F. the previous weekend. The weather was cold, but mother had dressed the infant in nothing but a shirt. As was her habit, mother also had not fed S.F. much and left him in a wet diaper for long periods of time until grandmother ultimately changed him. Grandmother said mother received no help from father, who only occasionally visited S.F., and that mother was about to be evicted. Grandmother said mother's neighbors told her that mother and father were "always fight[ing]," but didn't know if the fights were verbal or physical. The neighbors were afraid of mother and father and did not want to get involved. To grandmother's knowledge, mother had been placed on section 5150 holds three times. Grandmother said she was afraid of father, whom she had met only once at the child's birth. He was purportedly a gang member and told grandmother he "doesn't threaten, he just makes things happen."

S.F. was taken into protective custody on February 4. The child's diaper was saturated and his clothes, including his socks, were drenched with urine, the skin on his pelvis, inner thighs and the tip of his penis was red and irritated, he had discharge in one eye, and the back of his head was flat, suggesting the infant had spent long periods of time lying on his back.

The following day the CSW met father. He said he had been homeless for the past four or five years, and slept in parks, at friends' homes or on the streets. Father did not have a regular work schedule, but worked odd jobs to provide for S.F. Father said he visited S.F. every 10 days or two weeks, and stayed for up to a week at a time. Father told the CSW he brought diapers, clothes and formula and provided his son everything he needs. He and mother had prepared for S.F.'s birth, buying a bassinet, playpen and clothing, and father had pawned his jewelry to buy things for his son. Father wanted S.F. released to his custody so he could arrange for him to live with a paternal aunt. Father was unconcerned when the CSW described S.F.'s condition when taken into protective custody (i.e., his red and irritated thighs and urine-soaked clothing). He said mother acted normal with S.F. when he was around, was not abusing his son and that DCFS lacked a "leg to stand on."

At first, father denied any criminal history. He later admitted having served a 20-year sentence, but told the CSW he had done his time and was done talking about it.[4] Father then became confrontational and told the CSW he had not been in "'no chicken shit prison. [He] was in San Quentin, Folsom, Pelican Bay, [he] was in real prison and [he wasn't] afraid to go back.'" Father threatened that if DCFS did not return S.F. to his custody at the upcoming hearing he would "'drop the hammer'" and "'call every channel and newspaper.'" He explained that mother did not know how to defend herself, but he had told her, "'Don't just bark, throw chairs because chairs hurt. Then, they will listen.'" He threatened that at the hearing he would stop barking, would "'show the judge'" and it would "'be bad.'" Father believed that mother's neighbors were the source of the referral and planned to confront

---

[4] Father's criminal history includes convictions for resisting arrest, disorderly conduct, robbery, vandalism, assault with a firearm and kidnapping.

them. After the CSW advised him to remain calm, father replied, "'You're now acting like a lieutenant, captain, from Folsom, San Quentin, Pelican Bay . . . "Think about your release date. Don't do it, Son.'" Father refused to discuss his gang affiliation.

On February 7, DCFS filed a section 300 petition on behalf of S.F. The petition alleged that S.F. was at risk due to mother's history of substance abuse and mental health problems and her failure to take prescribed psychotropic medication, and because of father's historical and current marijuana use. The court found father to be a presumed father. On February 14, S.F. was detained and placed with his maternal grandparents, and the parents were given monitored visitation. At first, grandmother refused to monitor father's visits; that changed later.

On March 25, DCFS interviewed father in connection with its report for the April 3 jurisdictional/dispositional hearing. Father reported that he had never used drugs and never saw mother use drugs or alcohol. Father conceded that he understood when he met mother that she "'was not playing with a full deck.'" She told him she had been diagnosed with schizophrenia, heard voices and admitted she was "'not all there.'" He knew she had been hospitalized for mental health problems, that she was not taking medication and that she sometimes got hostile if someone gave her directions or instructions. Father also told DCFS that after S.F.'s birth, mother was hesitant to bathe, clean or feed him, and sometimes let S.F. continue to cry without responding to him. On several occasions he had instructed mother to feed and tend to S.F., but she refused. He had constantly instructed and educated mother as to how to bathe, feed, burp and clean S.F. because she either did those things incorrectly or refused to do them at all.

Father had very actively cared for S.F. at first, but left the family home when S.F. was three weeks old because of mother's behavior. Before he moved out, mother had shouted at him constantly and accused him of cheating on her. She watched him very closely whenever he prepared food because she was afraid he would poison her. Mother had instructed father not to feed S.F. because the child would "get 'fat,'" and insisted that the baby go to bed with her at 7:00 p.m. Father had tried to explain that the baby could not just sleep when mother wanted and offered to stay up with the baby, but mother insisted everyone go to sleep at

5

7:00 p.m. There were also occasions on which mother awoke at 2:00 a.m. and insisted on cleaning the house, even though she did not know how to clean, cook or care for the household, and he was the one who predominantly took care of the baby and did the household chores. After a few weeks father realized he could no longer live with mother. He contradictorily told the CSW that he "never felt that . . . mother would harm [S.F.] but . . . warned [her] not to harm his baby." Father told DCFS he had provided for S.F. and "accepted any and all responsibilities with being a presumed father," but was content with S.F. remaining in grandmother's care for the time being. He acknowledged that mother needed counseling and "needs to take her medications because without them, he does not believe that his son would be safe living with the mother." However, because he had not done "anything wrong," father refused to participate in reunification services.

DCFS interviewed grandmother for its jurisdictional report. She reported that mother was diagnosed with schizophrenia when she was 15, threatened to commit suicide numerous times, and was hospitalized for mental health issues as many as 10 times. Mother refused to take her prescribed medication, or would take it only for a short time. Once, in 2006, mother physically attacked grandmother and the police were summoned. Grandmother provided additional information regarding mother's inability to care for S.F., including her refusal to feed him, even though he cried incessantly out of hunger, for fear he would get "fat" and her concern for his safety. Grandmother said mother needed help and needed medication, and she did not believe mother was capable of caring for S.F. alone. She was willing to adopt S.F. if reunification efforts failed.

DCFS reported that mother's medical records revealed she had been prescribed psychotropic medication, a mood stabilizer, anti-seizure medication, and a medication used to treat schizophrenia. DCFS concluded that mother's condition was so severe and her behavior so defiant and unpredictable that releasing S.F. to her custody would place him at extreme risk of abuse and neglect. DCFS went on to observe that, "although mother was the primary caretaker of [S.F.] at the time of detention, it should not be forgotten that the father . . . was aware of some of the mother's disturbing behaviors, yet did not make a safety plan for the child." Further, in light of father's "descriptions of the mother . . . , it is not

6

unreasonable for the father to have known or to have been aware of the mother's mental instability, and given that he left his child under the care of the mother, knowing of the mother's unstable and erratic behaviors, the father was complicit in the neglect of his child." Both parents had exhibited combative, aggressive or threatening behavior. DCFS recommended that the juvenile court declare S.F. a dependent of the court, require mother to undergo a psychiatric evaluation and offer both parents reunification services and monitored visitation.

The April 3 hearing was continued so DCFS could interview mother.

In its April 28 supplemental report, DCFS noted that to date, mother had visited S.F. only once, and father had not visited at all.[5] Neither parent ever cancelled a visit or explained his or her absence. DCFS had tried unsuccessfully to contact mother to schedule an interview, but her phone was disconnected or would not accept messages.

DCFS reported that S.F. had adjusted appropriately to his grandparents' home and had developed a connection with the family. Grandmother reported S.F. was easy to soothe and enjoyed being held or wrapped in a blanket. She described him as "easygoing and mellow," and a solid sleeper.

Mother was not present at the April 28 adjudication hearing. The court received three DCFS reports into evidence, and the hearing proceeded by way of argument. At the outset, counsel for S.F. requested that the juvenile court amend the petition to add father to count (b)(1) regarding mother's mental health issues. Counsel argued that the evidence indicated that father "knew mother had mental health issues," and "decided he could no longer live with her," but nevertheless "left the residence and allowed [S.F.] to remain with mother knowing that mother really didn't have the ability to care for that child given her mental health issues." DCFS joined this request.

---

[5] This is inconsistent with information conveyed verbally at the April 28 hearing informing the court that grandmother had been monitoring father's visits.

7

Father requested that all allegations against him be stricken. His counsel also objected to the requested amendment, arguing "there being no notice of it, I would ask the court not make the finding. It appears the father has been denied any due process opportunity to address any such attempt to conform as to proof." The court indicated its intent to amend count (b)(1) to read: "father knew of mother's mental health issues and left the child with mother putting the child at risk." Father's counsel again objected, arguing that it was improper to conform the allegation to proof to add father to the (b)(1) allegation as to which he had not been named and had had no opportunity to prepare to defend. This exchange then took place:

"The Court: I'd be happy to put it over, if you wish.

"Father's Counsel: Noting the father's objection, your honor.

"The Court: So you don't want to put it over then?

"Father's Counsel: I am indicating the father received no notice—

"The Court: I said—

"Father's Counsel:—of the allegation. [DCFS] had more than adequate time to amend the petition if they really believed these things were an issue. They chose not to. I don't believe it's adequate process to now ask to conform to proof—

"The Court: Well—

"Father's Counsel:—for allegations [DCFS] made no attempt to include him in.

"The Court: I'd be happy to allow you additional time to have your client address those issues, some opposition. If you want a supplemental report to address these issues, I'd be happy to do that. We can put the adjudication over.

"Father's Counsel: . . . I don't believe it's the father's burden to now produce evidence to try to defend himself from an allegation that wasn't pled against him.

"The Court: It may be the pleading part but there's certainly ample evidence in the reports about father leaving this child with mother who had a history and father knew."

8

"Father's Counsel: And [DCFS] has had that . . . information, at least, since the 14th of February when they interviewed the father and chose not to proceed . . . by way of amendment or in any other fashion to change this petition."

After father rejected the court's offer to delay the adjudication hearing or to obtain a supplemental report, the court amended and sustained counts (b)(1) and (2), and struck the allegations of drug use against father.

When the court proceeded to disposition, father requested that S.F. be returned to his custody so he could "make a plan to allow his child to remain in the care of the maternal grandmother." His counsel acknowledged that father was homeless and currently unable to provide a home for S.F., but argued that he should be permitted to make the plan that S.F. remain with grandmother. The juvenile court found, by clear and convincing evidence, that S.F. could not safely be returned to either parent's custody. S.F. was removed from parental custody, and reunification services and monitored visits were ordered for both parents. Father appeals.

## DISCUSSION

Father notes that even before the petition in this matter was filed, DCFS knew he stayed with mother intermittently and helped care for S.F. He also notes that DCFS chose not to amend the petition despite that fact that long before the April 28 adjudication hearing, it knew both that father was aware of mother's mental health problems and that he had not made a safety plan for S.F. Accordingly, he contends it was a violation of due process and an act in excess of judicial authority when the court took "over the power of [DCFS] by adding an allegation to the petition against father . . . ." He also argues there is insufficient evidence to support the sustained allegation against him, and that the juvenile court erred by failing to consider and make appropriate findings regarding his custody request under section 361.2. Only father's final contention has merit.

1.      *The juvenile court appropriately amended the petition to conform to proof*

In dependency proceedings amendments to conform to proof are generally permitted, indeed, they are favored. (*In re Andrew L.* (2011) 192 Cal.App.4th 683, 688–689 (*Andrew L.*); *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1042 (*Jessica C.*).) The decision

9

to amend to conform to proof is largely in the discretion of the trial court and its determination will not be set aside unless it clearly appears its discretion was abused. (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31; *Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1377–1378.) An amendment to conform to proof should not be allowed if it changes the very nature of the issues which the adverse party had no opportunity to defend. (*Trafton*, at p. 31; *Andrew L.*, at p. 689 ["'If a variance between pleading and proof . . . is so wide that it would, in effect, violate due process to allow the amendment, the court should, of course, refuse any such amendment'"].) Where such an amendment is proposed, the court should, before allowing it, permit the adverse party to introduce evidence on the new issues. (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1212, pp. 645–646.) Otherwise, it "is error . . . to allow the amendment and render judgment without a further hearing." (*Id*. at p. 646.) Whether a variance is material depends on the circumstances of the case. (*Chelini v. Nieri* (1948) 32 Cal.2d 480, 486.) *Jessica C*. illustrated this concept with the following example: "[S]uppose a petition only alleges, under subdivision (d) of section 300, a variety of specific sexual acts perpetrated by a parent, but the trial judge does not find these are true. The county then attempts to amend the petition to allege serious *emotional* damage under subdivision (c) of section 300, based on the idea that any child who would make such allegations, even if false, has obviously been subject to emotional abuse. Such a tactic would be nothing more than a cheap way to establish dependency without giving the parent adequate notice of dependency jurisdiction under an emotional abuse theory." (*Jessica C.*, at p. 1042, fn. 14.)

No similar variance exists here. Unlike the *Jessica C*. 93 Cal.App.4th 1027 illustration, the juvenile court found the existing allegations of the petition regarding mother's inability to care for S.F. due to her mental health problems true. The court amended those allegations to add that father knew about mother's mental health issues and nevertheless left S.F. in her care, placing the infant at risk. DCFS's reports noted that, when interviewed in March 2014, father stated that he had always known mother had significant mental health problems, "'was not playing with a full deck,'" and that she had provided inadequate, or no care, for S.F. since his birth. Indeed, father was so concerned about S.F.'s

10

safety in mother's care that when he left the family home he "warned mother not to harm his baby," and told the CSW that, without counseling and medication "he [did] not believe that his son would be safe living with mother."

The record does not support father's claim that he was disadvantaged or denied due process. At the outset of the adjudication hearing, the court signaled its inclination to name father in an amended (b)(1) count relating to failure to protect S.F. The court noted that the record contained "ample evidence" about father having left S.F. in mother's care even though he knew she had an extensive history of severe mental health problems. Recognizing that father might want additional time to respond to the amended allegation, the court accordingly afforded him an opportunity to delay and fully prepare for the adjudication hearing. The court also offered to require DCFS to prepare a supplemental report to address the newly amended allegation. Father's counsel refused the court's offers, arguing only that DCFS had chosen not to amend its pleading, so it was not father's "burden to now produce evidence to try to defend himself from an allegation that wasn't pled against him."

In light of its intention to proceed in the manner it did, the court recognized that the evidentiary portion of the hearing should be reopened to allow (after an appropriate continuance) father to present evidence to refute the amended allegations. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188 ["[d]ue process requires that a parent is entitled to notice that is reasonably calculated to apprise him or her of the dependency proceedings and afford him or her an opportunity to object"]; *Nickolas F. v. Superior* Court (2006) 144 Cal.App.4th 92, 117–118 [juvenile court safeguarded parent's due process rights by providing him an opportunity to be heard, including the right to present evidence and confront witnesses].) Father, however, rejected the court's offer to continue the adjudication hearing and chose to forgo the opportunity to try to refute the new allegation.

Father does not argue he would have prepared his defense differently if the original petition had contained the language of the amendment. Nor does he point to any evidence he would have presented or argument he would have made had he been provided specific notice of the amendment. Further, the DCFS reports provided notice of the issues being litigated and the variance between pleading and proof was not so wide that the amendment to

11

conform to proof violated father's right of due process. The court committed no violation of father's due process rights by amending the petition to reframe the allegations to address father's admitted knowledge of mother's mental health problems and the negative and potentially dangerous impact those problems had and, if left untreated, would likely continue to have on S.F. The amendment conformed the allegations of the petition to the evidence before the juvenile court and did not cause father prejudice or mislead him to his detriment. (*Jessica C.*, *supra*, 93 Cal.App.4th at pp. 1042–1043; see *Andrew L.*, *supra*, 192 Cal.App.4th at p. 689 [amendment to dependency petition did not violate due process where parent had explicit notice of issues being litigated and court conducted full hearing affording each party opportunity to be heard].)[6] Regardless of the way the amendment occurred, all parties were on equal notice of the change minor's counsel proposed and the court made it clear it was prepared to provide ample opportunity for the parties to fully and fairly litigate the issues and their legal rights in the context of a full hearing. Under the circumstances, no unfairness or prejudice to father resulted. (*Andrew L.*, at p. 690.)

2.      *Remand is required for findings under section 361.2*

Father argues that the juvenile court erred when it failed to make the requisite findings when it declined to release S.F. to his legal custody or to permit him to make a plan that would allow the child to remain placed with grandmother. We agree that the court failed to make the requisite findings, and that remand is required for the juvenile court to consider and make proper findings under section 361.2, subdivision (a).

---

[6] Moreover, even if we assume for purposes of discussion an error or a violation of due process in the assertion of jurisdiction on this basis, father does not challenge the sufficiency of the evidence to support the jurisdictional allegations as to mother. Because substantial evidence supported a finding of jurisdiction as to mother, any impropriety in the amendment of the petition with respect to father did not affect the juvenile court's assumption of jurisdiction, even if father's conduct did not form an independent basis for jurisdiction. (See, e.g., *In re Alexis H.* (2005) 132 Cal.App.4th 11, 16; *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397 ["a jurisdictional finding good against one parent is good against both"].)

"Section 361.2 establishes the procedures a court must follow for placing a dependent child following removal from the custodial parent pursuant to section 361."[7] (*In re Z.K.* (2011) 201 Cal.App.4th 51, 70; *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1820–1821 (*Marquis D.*).) When a juvenile dependency court orders removal of a child under section 361, the court first must determine whether there is a parent who wants to assume custody who did not reside with the child at the time the events that brought the child within the provisions of section 300 occurred. (§ 361.2, subd. (a).) "If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) And the court must state the bases for its determination "either in writing or on the record." (§ 361.2, subd. (c); *In re Jonathan P.* (2014) 226 Cal.App.4th 1240, 1252–1253.)[8]

---

[7] As relevant here, section 361 provides: "(c) A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . :

"(1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . ."

[8] We recognize there is a split of authority as to whether section 361.2, subdivision (a) applies to both "offending" and "nonoffending" noncustodial parents. (Compare, e.g., *In re A.A.* (2012) 203 Cal.App.4th 597, 608 [an offending noncustodial parent is not entitled to consideration under section 361.2, subd. (a)], and *In re John M.* (2013) 217 Cal.App.4th 410, 424–425 [in which this court, in dicta, reached the same result], with *In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1505–1506 [plain language of section 361.2, subd. (a) precludes consideration of whether noncustodial parent is "offending" and any relevant facts may appropriately be considered as part of detriment determination under that statute]; and *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 300–303 [same].) We need not address this issue here, where the juvenile court made no finding that father was offending and failed to state any basis for its detriment finding.

A court's ruling under section 361.2, subdivision (a) that a child should not be placed with a noncustodial parent must be made by clear and convincing evidence. (*Marquis D.*, *supra*, 38 Cal.App.4th at pp. 1827–1829; *In re Isayah C.* (2004) 118 Cal.App.4th 684, 699–700 (*Isayah C.*).) The clear and convincing evidence standard requires evidence so clear "as to leave no substantial doubt." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426.) On appeal, we employ the substantial evidence test, bearing in mind the heightened burden of proof. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)

Father argues that the trial court refused his request for custody without ever making—on clear and convincing evidence or otherwise—the findings required by section 361.2. DCFS implicitly acknowledges that the court failed to make these findings, but argues that the "same evidence that supports [S.F.'s] removal also supports the detriment findings." We are at a loss to understand DCFS's assertion, given that the juvenile court did not make *any* detriment finding. This, even though since 1994, section 361.2, subdivision (c) has required an express finding of detriment. (Stats.1994, ch. 461, § 1, p. 2166.)

At disposition, after listening to the parties' arguments as to whether S.F. should be released to father subject to his plan for the child to remain in grandmother's care, the court's verbal ruling stated only that "the care, custody, control of the child is taken from the parents . . . pursuant to section 300 . . . , as the court does find by clear and convincing evidence there's a substantial danger to the minor's physical and mental well-being. There is no reasonable means to protect without removal. [¶] Reasonable efforts have been made to prevent the removal." The minute order yields no more useful information. It states that "[b]y clear and convincing evidence pursuant to . . . [section] 361[, subdivision] (c): Substantial danger exists to the physical health of minor(s) and or minor(s) is suffering severe emotional damage, and there is no reasonable means to protect without removal from parent's or guardian's physical custody," and that ""[r]easonable efforts have been made to prevent or eliminate the need for removal . . . ."

Although some courts have done so (see *In re Andrea G.* (1990) 221 Cal.App.3d 547, 554–555; *In re Corienna G.* (1989) 213 Cal.App.3d 73, 83–85), we decline to imply a finding of detriment. Implying a finding of detriment under section 361.2, presupposes the

14

court considered the correct code provision. However, we find no reference to any of section 361.2's requirements regarding placement with a noncustodial parent anywhere in DCFS's reports, the hearing transcript or the court's order. Rather, the court removed S.F. pursuant to sections 300 or 361, subdivision (c), sections that are either irrelevant to disposition or that did not apply to father with whom S.F. did not reside at the time the petition was initiated.

Thus, it is not clear the court ever considered the statutory provision applicable to father's request for custody of S.F. in accordance with his plan.[9] We are not satisfied on this record that the trial court adequately explored whether placing S.F. with father would be detrimental to him within the meaning of section 361.2, subdivision (a) or that implied findings are warranted. (See *In re R.S.* (1985) 167 Cal.App.3d 946, 961.) Moreover, even if the court had considered the correct code provision, we would be reluctant to imply that it made a finding of detriment based on the evidence presented. Where insufficiency of the evidence is an issue, an appellate court reviews the entire record in the light most favorable to the order and determines whether any substantial evidence supports the conclusion of the trier of fact. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924.) However, where the trial court fails to make express findings the appellate court generally implies such findings only where the evidence is clear. (See, e.g., *In re Andrea G.*, *supra*, 221 Cal.App.3d at pp. 554–555 ["ample" evidence supported implied finding and result "obvious" from the record]; *In re Corienna G.*, *supra*, 213 Cal.App.3d at pp. 83–84 [substantial evidence "amply" supported an implied finding].)

DCFS argues that the same evidence that supported the juvenile court's jurisdictional findings made by a preponderance of evidence would also support a finding (by clear and

---

[9] We note that father, who was homeless at the time of the disposition hearing, recognized that he was in no position to ask that S.F. be placed in his physical care. Rather, he requested custody of S.F., but proposed that the child remain in grandmother's care. His request may not have been unreasonable. "[A] parent may have custody of a child, in a legal sense, even while delegating the day-to-day care of that child to a third party for a limited period of time. (*Isayah C.*, *supra*, 118 Cal.App.4th at p. 700.)

convincing evidence) of detriment, given that father exposed S.F. to risk by leaving him in mother's care, and that father has a history of violent crime, engaged in arguably threatening behavior at the outset, is homeless and refused to participate in reunification services. DCFS also contends that father's plan to leave S.F. with grandmother was "somewhat problematic" given that she feared father. The latter point is a red herring; by disposition, grandmother was monitoring father's visits with S.F. without incident and with DCFS's apparent permission.

"In making a finding of detriment, the court may consider any jurisdictional findings that may relate to the noncustodial parent under section 300, as well as any other evidence showing there would be a protective risk to the child if placed with that parent." (*In re V.F.* (2007) 157 Cal.App.4th 962, 970 (*V.F.*).) Leaving S.F. in mother's care is by far the most serious issue raised by DCFS and demonstrates poor judgment on father's part, as do his threats and his refusal to participate in reunification services. However, on remand, these factors must be viewed in the context of the entire record to determine whether giving father legal custody of S.F. would be detrimental. There is no evidence S.F. suffered harm in father's care. The record contains undisputed evidence that, before S.F. was detained, father visited every 10 days or so for up to a week at a time, and provided necessities for his son before and after his birth. In addition, when father was around, he provided most or all of S.F.'s daily care and tried to instruct mother as to how to care for and feed S.F. According to DCFS's own reports, S.F. was well cared for by grandmother, had adjusted well and was content and in good health. DCFS, mother, father and S.F.'s counsel all agreed it was in S.F.'s best interest to remain in grandmother's care at least for the time being, and in the event reunification was not possible.[10] A parent invoking section 361.2 is usually expected to make appropriate arrangements for the child's care in a suitable setting. (*V.F.*, at p. 971;

---

[10] It is not clear from the record whether father intended ultimately to try to provide a home for S.F., or to leave him with grandmother indefinitely. It is clear, however, that the trial court's decision did not turn on this point. Moreover, if it had, father should have been told so he could make his intentions clear, or possibly change them, if doing so could affect the court's decision. (See *Isayah C.*, *supra*, 118 Cal.App.4th at p. 700, fn. 12.)

16

*Isayah C.*, *supra*, 118 Cal.App.4th 684, 699–700; *In re Erika W.* (1994) 28 Cal.App.4th 470, 476.) A clear and convincing evidence standard of proof applies to the section 361.2, subdivision (a) decision whether placing S.F. in the care of his father and allowing father to make a plan for his care would be detrimental. We question whether viewing the record as a whole, a trial court could reasonably find that maintaining S.F. in the same placement DCFS itself recommends would be detrimental to the child. In any event, this is certainly not the clear-cut case in which an appellate court may imply such a finding.

We agree with those courts that have declined to imply a finding of detriment under section 361.2 that the better practice is to remand the matter to the juvenile court to consider the facts in accordance with the appropriate statutory provision. (*V.F.*, *supra*, 157 Cal.App.4th 962, 973; *Marquis D.*, *supra*, 38 Cal.App.4th at pp. 1821–1824.) "Section 361.2, subdivision (c) is directed to the juvenile court, and we do not believe making express findings is an appropriate task for a reviewing court. This view comports with the long-standing rule that the reviewing court is not the finder of fact. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405 ['"it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law"' [citations]]; [citation].)" (*V F.*, at p. 973.)

Dependency statutes embody three principal goals for children adjudged dependents of the juvenile court: "(1) [t]o protect the child [citation]; (2) to preserve the family and safeguard the parents' fundamental right to raise their child, so long as these can be accomplished with safety to the child [citation]; and (3) to provide a stable, permanent home for the child in a timely manner." (*In re Santos Y.* (2001) 92 Cal.App.4th 1274, 1317.) Section 361.2 evidences a legislative preference for placement of a dependent child with a noncustodial parent who requests custody, absent a finding of detriment. (*In re John M.* (2006) 141 Cal.App.4th 1564, 1569.) In view of these goals and the legislative preference, we will reverse the dispositional findings as to father and remand the matter with directions to the juvenile court to conduct a hearing to consider and make findings under section 361.2, subdivision (a) in writing or on the record. (*V.F.*, *supra*, 157 Cal.App.4th at pp. 971–974; § 361.2, subd. (c).)

## DISPOSITION

The jurisdictional findings and order declaring S.F. a dependent of the juvenile court are affirmed, but the dispositional order is reversed with regard to father. The dispositional order is affirmed in all other regards as to mother. The juvenile court is directed to conduct a new dispositional hearing to consider and make findings in accordance with Welfare and Institutions Code section 361.2 as to father's request for custody of S.F. and placement of the child in the home of the maternal grandmother.

NOT TO BE PUBLISHED.


                                                    JOHNSON, J.


We concur:


        ROTHSCHILD, P. J.


        CHANEY, J.


18